No. 19-1250

In the United States Court of Appeals
For the Tenth Circuit

AHMAD AJAJ,

*Plaintiff-Appellant,*

v.

FEDERAL BUREAU OF PRISONS, *ET AL.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
For the District of Colorado**
Civil Action No. 1:15-cv-0092-RBJ-KLM
The Honorable R. Brooke Jackson

**APPELLANT'S SUPPLEMENTAL BRIEF**

KATIE HEIDEMAN, *Student Attorney*
ZOË WILLIAMS, *Student Attorney**
NICOLE B. GODFREY
LAURA ROVNER
University of Denver Sturm College of Law | Civil Rights Clinic
2255 East Evans Avenue, Suite 335
Denver, Colorado 80208
(303) 871-6155

*Counsel for Plaintiff-Appellant*

**ORAL ARGUMENT IS REQUESTED**

---

* Hunter Ross, a Civil Rights Clinic student attorney, assisted in the drafting and preparation of this brief.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................2

TABLE OF AUTHORITIES ..............................................................3

SUMMARY OF ARGUMENT ...........................................................5

INTRODUCTION...............................................................................5

ARGUMENT ......................................................................................6

   I.   **Tanzin Requires Remanding Mr. Ajaj's Individual Capacity RFRA Claims to the District Court.** ....................................................7

   II.  **Applying the Court's Rationale in Tanzin, Qualified Immunity Should Not be Available as a Defense to RFRA Violations.**........................9

     A.   ***Tanzin*'s Reasoning Shows Qualified Immunity Is Unavailable as a RFRA Defense.** ....................................................................10

     B.   **Basic Tenets of Statutory Interpretation Establish That Qualified Immunity is Unavailable as a Defense to RFRA Claims.**.............15

CONCLUSION..................................................................................20

ORAL ARGUMENT STATEMENT .................................................20

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .........21

CERTIFICATE OF SERVICE ..........................................................22

CERTIFICATE OF DIGITAL SUBMISSION..................................23

*TANZIN V. TANVIR* .......................................................................24

BRIEF FOR THE PETITIONERS, *TANZIN V. TANVIR* ................35

# TABLE OF AUTHORITIES

## Cases

*Baxter v. Bracey*, 140 S. Ct. 1862 (2020) ..................................................11

*Berry v. Funk*, 146 F.3d 1003 (D.C. Cir. 1998) ................................ 17, 19

*Blake v. Wright*, 179 F.3d 1003 (6th Cir. 1999) ........................ 17, 18, 19

*Burwell v. Hobby Lobby Stores, Inc.*,  573 U.S. 682 (2014) ...................................14

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ...................................18

*Davilla v. Gladden*, 777 F.3d 1198 (11th Cir. 2015)...............................13

*Fazaga v. Federal Bureau of Investigation*, 965 F.3d 1015 (9th Cir. 2020)...........13

*Ghailani v. Sessions*, 859 F.3d 1295 (10th Cir. 2017)...................... 15, 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429

  (2006)...........................................................................................15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................ 11, 12, 14, 16

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) .................14

*Jamison v. McClendon*, No. 3:16-CV-595-CWR-LRA, ---F.Supp.3d---, 2020 WL

  4497723 (S.D. Miss. Aug. 4, 2020)........................................................11

*Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012) ...................................13

*Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012)...........................................13

*Pierson v. Ray*, 386 U.S. 547 (1967) ............................................... 11, 18

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000)......................15

*Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008) ......................................12

*Rasul v. Myers*, 555 U.S. 1083 (2008)....................................................................12

*Seneca–Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019

  (10th Cir. 2003) ...............................................................................................16

*Sossamon v. Texas*, 563 U.S. 277 (2011)...................................................................8

*Tanzin v Tanvir*, 141 S. Ct. 486 (2020) ...................... 5, 6, 7, 8, 9, 10, 12, 13, 14, 19

*Tanzin v. Tanvir*, 140 S. Ct. 550 (2019) ...........................................................5, 18

*Tapley v. Collins*, 211 F.3d 1210 (11th Cir. 2000)..................................................17

*United States v. Brown*, 529 F.3d 1260 (10th Cir. 2008) ................................. 15, 16

*Wornell v. Henry*, 219 F.3d 1197 (10th Cir. 2000)....................................................9

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)................................................................13

**Statutes**

18 U.S.C. § 2520....................................................................................................17

28 U.S.C. § 2697......................................................................................................8

42 U.S.C. § 1983..................................................................................................8, 11

42 U.S.C. § 2000bb........................................................................ 7, 14, 15, 16, 17

## SUMMARY OF ARGUMENT

The second issue Appellant Ahmad Ajaj presented on appeal is whether the district court erred by dismissing his individual capacity Religious Freedom Restoration Act (RFRA) claims for damages on the grounds that RFRA does not permit such a remedy. Appellant's Opening Br., at 3. The Supreme Court has now answered that question in the affirmative. *Tanzin v Tanvir*, 141 S. Ct. 486, 489 (2020). This issue has been resolved, and this Court should remand the RFRA claims against individual defendants to the district court to proceed with discovery.

However, should the Court consider whether qualified immunity provides an alternative basis by which it could affirm the district court's dismissal of Mr. Ajaj's claims, the rationale offered by the Court in *Tanzin* supports the conclusion that qualified immunity should not be an available defense to RFRA claims.

## INTRODUCTION

On November 8, 2019, Mr. Ajaj filed his opening brief in this case. In his brief, he presented two issues for appellate review, the second of which is relevant to this supplemental brief:

> Did the district court err in concluding [RFRA] does not allow for a damages remedy against individual-capacity defendants . . .?

Appellant's Opening Br., at 3.

On November 22, 2019, the Supreme Court granted certiorari in *Tanzin v. Tanvir*, No. 19-71. 140 S. Ct. 550, 550 (2019). The question presented to the Court

in *Tanzin* was "[w]hether the Religious Freedom Restoration Act of 1993, 42 U.S.C. 2000bb et seq., authorizes suits seeking money damages against individual federal employees." Br. for the Petitioners, 2020 WL 92202, at *I (Jan. 6, 2020).

Recognizing *Tanzin* presented "one of the questions [Mr. Ajaj] raised in this appeal," Defendants-Appellees requested this Court stay this case pending the Supreme Court's decision in *Tanzin* because "[w]hatever the parties might say on that issue now would likely be overtaken by" *Tanzin*. Defendants-Appellees' Unopposed Motion for Stay of Briefing, or in the Alternative for Extension of Time to File Appellee Br., at 1, 3 (Dec. 6, 2019). On December 6, 2019, this Court granted Defendants-Appellees' motion, placing this case in abeyance pending the Supreme Court's decision in *Tanzin*. On December 10, 2020, the Supreme Court issued its opinion, holding that RFRA allows for individual capacity suits for damages against federal officials. *Tanzin*, 141 S. Ct. at 489.

On December 30, 2020, this Court granted Mr. Ajaj leave to file the present Supplemental Brief to explain how *Tanzin* impacts the instant appeal. Order Granting Appellant's Request to File a Supplemental Br., at 2-3 (Dec. 30, 2020).

## ARGUMENT

*Tanzin* requires remand of Mr. Ajaj's individual capacity RFRA claims to the district court because the Supreme Court's decision directly resolves the second issue presented to this Court. However, should the Court consider alternative

6

grounds on which to affirm the decision below, it should not grant Defendants-Appellees qualified immunity. The text of RFRA does not provide for the defense of qualified immunity, and *Tanzin* counsels against the type of judicial policymaking which would allow a federal court to read a defense into a statute when Congress did not provide for such a defense.

## I.    *Tanzin* Requires Remanding Mr. Ajaj's Individual Capacity RFRA Claims to the District Court.

Mr. Ajaj brought claims for monetary damages under RFRA, 42 U.S.C. § 2000bb *et seq.*, against government officials in their individual capacities. *See* Joint. App., Vol. 1, at 145-50. Upon referral of the Defendants-Appellees' motion to dismiss, the magistrate judge concluded that RFRA does not allow individual capacity suits for damages and recommended the claims be dismissed. Joint. App., Vol. 4, at 485. The district court adopted the magistrate judge's reasoning and dismissed the claims. Joint. App., Vol. 6, at 749-50. Mr. Ajaj appealed, asking this Court whether the lower court erred in concluding that RFRA does not allow for individual capacity damages claims. Appellant's Opening Br., at 3. Since then, the Supreme Court unanimously held that RFRA permits individual capacity suits for monetary damages against government officials. *Tanzin*, 141 S. Ct. at 489.

The Court decided *Tanzin* based on the traditional rules of statutory interpretation. *See id.* ("As usual, we start with the statutory text."). The Court first addressed whether RFRA allows plaintiffs to sue government officials in their

individual capacities. *Id*. at 490. RFRA states that plaintiffs may bring suit and obtain "appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). RFRA defines a "government" to include an "official (or other person acting under the color of law) of the United States." § 20000bb-2(1). Using this definition, the Court concluded that RFRA's plain language extended the term "government" beyond its ordinary meaning to include federal officials. *Tanzin*, 141 S. Ct. at 490. The Court went on to explain that RFRA expanded the term "officials" to include people acting under the color of law. *Id.* The Court understood this to mean that "government," as defined by RFRA, "includes both individuals who are officials acting under the color of law *and* other, additional individuals who are nonofficials acting under the color of law." *Id*. (emphasis in original). In other words, the *Tanzin* Court concluded that RFRA allows for claims against federal officials in their individual capacity, like the claims asserted in this case by Mr. Ajaj. *See* Joint. App., Vol. 1, at 145-50 (RFRA claims).

Having determined that RFRA allows for individual capacity suits, the Supreme Court then turned to whether "appropriate relief" includes monetary damages. *Id*. at 491. The Court first determined that the meaning of "appropriate relief. . . is inherently context dependent." *Id*. (internal quotation marks omitted) (citing *Sossamon v. Texas*, 563 U.S. 277, 286 (2011)). With this in mind, the Court acknowledged that federal courts have long awarded damages as a remedy against government officials in their individual capacities. *Id*. Currently, such damages are

awarded through the Westfall Act, 28 U.S.C. § 2697 (1988), and 42 U.S.C. § 1983. *Id*. The Court concluded that not only are damages against individual government officials consistent with historic and modern law, they are also the only form of relief that can remedy some RFRA violations. *Id*. at 491-92.

The Court's straightforward, unanimous decision leaves no room for any conclusion other than the district court erred by dismissing Mr. Ajaj's individual capacity RFRA claims. Accordingly, this Court should reverse the district court's order dismissing the claims and remand with instructions to proceed to discovery.

## II.  Applying the Court's Rationale in *Tanzin*, Qualified Immunity Should Not be Available as a Defense to RFRA Violations.[1]

Given the clarity of *Tanzin*, Mr. Ajaj anticipates Defendants-Appellees will next raise qualified immunity as a defense to liability. The question of whether Defendants-Appellees are entitled to qualified immunity should be answered in the district court so that all parties may have "an adequate opportunity to advance their arguments." *See Wornell v. Henry*, 219 F.3d 1197, 1215 (10th Cir. 2000). Further, the decision of whether qualified immunity is available as a defense to RFRA claims must be considered in light of the Supreme Court's guidance in *Tanzin*, and presents a question that should be answered in the first instance by the district court.

---

[1] Mr. Ajaj contends that the Court should remand the individual capacity RFRA claims and not look beyond the simple question answered by the Supreme Court. Mr. Ajaj raises this argument only in the event this Court elects to consider whether the record supports affirmance based on qualified immunity.

However, should this Court address whether the record supports affirmance based on qualified immunity, it should hold the defense unavailable for RFRA claims. In *Tanzin*, both parties agreed that qualified immunity was available, so the Court did not directly answer the question. *See Tanzin*, 141 S. Ct at 492, n.\*. However, the Supreme Court's reasoning and basic tenets of statutory interpretation clarify that determining whether qualified immunity is a defense to RFRA violations is a policy decision that must be left to Congress, not the courts. Even so, if qualified immunity is available as a defense to RFRA claims, Mr. Ajaj adequately plead violations of clearly established law. *See* Joint. App., Vol. 3, at 290-98.

## A. *Tanzin*'s Reasoning Shows Qualified Immunity Is Unavailable as a RFRA Defense.

In contemplating whether "appropriate relief" includes monetary damages, the *Tanzin* Court said:

> To the extent the Government asks us to create a new policy-based presumption against damages against individual officials, we are not at liberty to do so. *Congress is best suited to create such a policy*. *Our task is simply to interpret the law as an ordinary person would*.

*Id*. at 493 (emphasis added). The same reasoning applies to the availability of qualified immunity as a defense to RFRA claims. That is, in light of *Tanzin*, the judiciary is not permitted to create a policy-based presumption that the defense is available. *See id*. Such a decision must be left to Congress. *See id*.

Qualified immunity is a judicially created policy choice. *See, e.g.*, *Baxter v. Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from the denial of certiorari) ("[T]he Court adopted the test . . . because of a balancing of competing values about litigation costs and efficiency . . .") (internal quotation marks omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982) ("[P]ublic policy at least mandates an application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial."); *see also Jamison v. McClendon*, No. 3:16-CV-595-CWR-LRA, ---F.Supp.3d---, 2020 WL 4497723, at *13 (S.D. Miss. Aug. 4, 2020) ("This 'clearly established' requirement is not in the Constitution or a federal statute. The Supreme Court came up with it in 1982.").

The doctrine of qualified immunity emerged in relationship to civil rights legislation such as the Ku Klux Act, now codified as 42 U.S.C. § 1983—a policy designed to disrupt racially charged violence against Black Americans and government unwillingness to intervene. *Jamison*, 2020 WL 4497723, at *9-10. The Ku Klux Act, both in its original form and in its current state, does not include any form of immunity. *See id.* at 12-13. The Supreme Court created the defense in *Pierson v. Ray*, 386 U.S. 547 (1967). In that case, the Court reasoned that public officials had been generally immune from tort suits if they acted in good faith. *Id.* at 555-57. It therefore attached the same immunity to Section 1983 claims, which seek damages based on constitutional violations. *Id.* at 557. The Court subsequently

created the clearly established law standard in *Harlow*, 457 U.S. at 818. The Court

based its decision, which strays away from the common law tort immunity standard,

on the policy benefits of protecting public officials from individual capacity suits.

*Id.* at 813 ("[P]etitioners assert that public policy at least mandates an application of

the qualified immunity standard that would permit the defeat of insubstantial claims

without resort to trial. We agree.").

In *Tanzin*, the Supreme Court made clear it no longer engages in the sort of

judicial policymaking that attaches defenses and remedies to statutes when Congress

opted not to do so itself. *See* 141 S. Ct. at 493. Instead, the Court considered the

plain meaning of the RFRA statute and determined that "appropriate relief" includes

money damages. *Id.* at 489. This is a far cry from the Court's 1982 *Harlow* decision,

in which it decided—absent any guidance from Congress—that government officials

were entitled to immunity when their conduct did not violate a right of which a

reasonable person would have known. 457 U.S. at 818.

Moreover, the question of whether the defense of qualified immunity should

extend to RFRA claims has not received consistent treatment prior to *Tanzin*. Indeed,

there was "uncertain[t]y about whether qualified immunity is available to federal

officials sued under RFRA." *Rasul v. Myers*, 512 F.3d 644, 676 n.5 (D.C. Cir. 2008)

(Brown, J., concurring), *vacated on other grounds by Rasul v. Myers*, 555 U.S. 1083

(2008). Some appellate courts allowed defendants to raise qualified immunity in

defense of RFRA claims when the parties stipulated to its availablility or the plaintiff(s) did not argue unavailability. *See, e.g.*, *Fazaga v. Federal Bureau of Investigation*, 965 F.3d 1015, 1060 (9th Cir. 2020) (parties not disputing the availability of qualified immunity); *Davilla v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015) (applying qualified immunity when the plaintiff did not argue unavailability); *Padilla v. Yoo*, 678 F.3d 748, 762 (9th Cir. 2012) (applying qualified immunity absent an unavailability argument). The Fourth Circuit found qualified immunity is available as a defense to RFRA claims despite admitting the question had not been presented. *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012). However, these cases are distinguishable because the plaintiffs did not argue unavailability, the courts did not address arguments of statutory interpretation, and they all came before *Tanzin*.

Courts considering the question post-*Tanzin* must grapple with the Court's guidance that, absent express language from Congress, federal courts must not make policy decisions in cases involving statutory claims. That is, the Court must interpret a statute as an ordinary person would, and any policy decisions about the propriety of certain relief or defenses must be left to Congress. *See Tanzin*, 141 S. Ct. at 493; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part) (discussing how the Court's current qualified immunity jurisprudence has strayed away from the common law immunity standards).

Applying *Tanzin*'s rationale, no ordinary person could interpret RFRA's provision of judicial relief to apply only when the substantial burdens on religious exercise have been clearly established in prior law of which a reasonable person would be aware.[2] *See* 42 U.S.C. 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.").

Moreover, the decision of whether to extend qualified immunity to RFRA violations is rife with public policy concerns. It requires weighing the need to shield public officials from liability for performing their duties against Congress's clear desire to afford individuals strong protections for the free exercise of religion. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1133 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Considering whether RFRA allows damages claims, the Court declined to "retroactively impose [a presumption against damages] on a Congress that acted 27 years ago." *See* 141 S. Ct. at 493. The same restraint must apply to creating a presumption in favor of qualified immunity. That is, this Court is not in a position to create a presumption that Congress intended the defense to be available when Congress stayed silent. Congress, not the courts, must decide whether to make qualified immunity available

---

[2] *See Harlow*, 457 U.S. at 818 (establishing the clearly established law standard).

as a defense against RFRA claims. And, as discussed below, Congress chose not to include qualified immunity as a defense when enacting RFRA.

### B. Basic Tenets of Statutory Interpretation Establish That Qualified Immunity is Unavailable as a Defense to RFRA Claims.[3]

The express inclusion of one defense in a statute suggests that the legislature had no intent to allow additional defenses not included. *See United States v. Brown*, 529 F.3d 1260, 1265 (10th Cir. 2008). Upon a textual examination of the RFRA statute, this rule shows the unavailability of qualified immunity as a defense to RFRA claims.

The text of RFRA does not state the defense of qualified immunity may be used to shield a public official from liability. 42 U.S.C. § 2000bb *et seq*. However, the statute does have an express defense provision that, if satisfied, protects public officials from liability. § 20000bb-1(b); *see also Ghailani v. Sessions*, 859 F.3d 1295, 1306 (10th Cir. 2017) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)) (recognizing "[s]ubsection (b) of RFRA is an 'affirmative defense'"). Specifically, a public official may not be found liable if the

---

[3] While Mr. Ajaj did not make this argument in the district court, this is a situation in which the Court should consider these statutory interpretation arguments if it decides that the question of qualified immunity is relevant to this appeal. Whether *Tanzin*'s rationale supports a conclusion that qualified immunity is available as a defense against RFRA claims requires consideration of the RFRA text. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271 (10th Cir. 2000) (holding it appropriate to consider arguments not raised below in certain circumstances).

burden imposed on religious exercise is in furtherance of a compelling governmental interest and the least restrictive means of achieving the interest. *See* § 20000bb-1(b). The inclusion of this defense, coupled with silence as to qualified immunity, demonstrates that Congress contemplated defenses to RFRA claims and did not include qualified immunity among the statute's defenses.

The "clearly established" law standard had existed for more than one decade when Congress passed RFRA in 1993. *Harlow*, 457 U.S. at 817. Given the prevalence of qualified immunity at the time, Congress would have included express language had it intended to make the policy-based defense available to RFRA claims. This conclusion is supported by the doctrine of *expressio unius est exclusio alterius*, which provides that "the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." *Brown*, 529 F.3d at 1265 (quoting *Seneca–Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1034 (10th Cir. 2003)). In passing RFRA, Congress carved out a clear compelling interest and least restrictive means defense for public officials. § 20000bb-1(b). Congress explicitly created an "exceptions" subsection but did not include qualified immunity as such an exception. *See id*. Therefore, Congress did not intend for the defense to be available to RFRA violations.

Federal courts of appeal are split on the question of whether Congress's silence as to qualified immunity, when coupled with express language providing for

another defense, means that it intended to make the qualified immunity defense unavailable for that statute. For example, the Federal Wiretap Act, also known as Title III, shields government officials from liability when their conduct (illegal wiretapping) is based on a "good faith reliance" on a court order or a request from law enforcement personnel, among other things. 18 U.S.C. § 2520(d)(1)-(3). These cases are instructive because, just like Title III, RFRA contains an express defense provision that makes no mention of qualified immunity. § 2000bb-1(b).

The D.C. Circuit addressed whether the good faith defense section makes qualified immunity unavailable as a defense to Title III claims. It held:

> [T]he qualified immunity doctrine applied to constitutional torts and § 1983 actions has no application to his [Title III] claims. That is so because Title III itself provides a complete defense for "[a] good faith reliance on ... a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization . . . ." *When Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates*.

*Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) (emphasis added). Alternatively, the Sixth Circuit held that Title III's inclusion of a defense did not preclude application of the qualified immunity defense. *Blake v. Wright*, 179 F.3d 1003, 1013 (6th Cir. 1999). The Eleventh Circuit agreed with *Blake's* reasoning when it addressed the same question. *Tapley v. Collins*, 211 F.3d 1210, 1217 (11th Cir. 2000). This Court, particularly in light of *Tanzin's* strong preclusion of judicial

policymaking, should apply *Berry*'s rationale to the decision of whether it can graft qualified immunity to RFRA claims.

Both the *Blake* and *Tapley* courts premised their decisions on the notion that qualified immunity is a judicially-created defense to suit created based on the need for public officials to have an additional layer of protection that private citizens do not enjoy. *See, e.g.*, *Blake*, 179 F.3d at 1013 ("The courts crafted qualified immunity to protect public officials from civil liability when they perform discretionary activities in their official capacity."). But these courts did not grapple with the distinctions between the statutes at issue and Section 1983, the statute onto which the Court originally grafted qualified immunity. *See Pierson*, 386 U.S. at 555-56. Section 1983, in contrast to both Title III and RFRA, does not include a specific defense provision. By ignoring this distinction, the *Blake* court disregarded the rule that federal courts should refrain from "the unusual exercise of lawmaking" when "Congress addresses a question previously governed by a decision rested on federal common law." *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981).

Furthermore, with the additional guidance of *Tanzin*, it is clear *Blake* represents impermissible judicial legislating. As discussed *supra* Sec. IIA, *Tanzin* expressly stated that the Court is not in a position to create a policy-based presumption against damages actions. 141 S. Ct at 493. The same rule applies to creating a policy-based presumption regarding the existence of a qualified immunity

defense. As the *Blake* court recognized, qualified immunity is a judicially created policy defense. 179 F.3d at 1012. Yet it assumed, despite Congress creating a clear defense subsection, that it was authorized to graft the defense of qualified immunity onto the statute. *See id.* at 1013. If the *Blake* court had addressed the question today the result would likely be different because *Tanzin* makes clear that courts lack the power to circumvent the legislative process and create policy presumptions in statutes. *See Tanzin*, 141 S. Ct at 493.

In the case of Title III, Congress knew of the defense of qualified immunity and replaced it with the far more limited good faith defense. *Compare Berry*, 146 F.3d 1013 (holding that Congress, by including the defense, "occupied the field") *with Blake*, 179 F.3d at 1013 (finding that "police officers and public officials performing governmental functions should not lose their qualified immunity" because Congress included another affirmative defense in the statute). Similarly, with RFRA, Congress knew of the defense of qualified immunity yet replaced it with the compelling government interest and least restrictive means defense. *See Ghailani*, 859 F.3d at 1306. Because this Court is not authorized to circumvent the legislative process by presuming that Congress intended RFRA to include the additional defense of qualified immunity, this Court should not allow Defendants-Appellees to escape liability for burdening Mr. Ajaj's sincerely-held religious beliefs by granting them immunity.

## CONCLUSION

For the reasons stated above, this Court should remand Mr. Ajaj's individual capacity RFRA claims to the district court with instructions to proceed to discovery. In the event the Court considers whether the record supports affirmance based on qualified immunity, it should hold that the defense does not apply to RFRA claims.

## ORAL ARGUMENT STATEMENT

As Mr. Ajaj stated in his opening brief, his first question on appeal necessitates oral argument. Should this Court choose to address whether qualified immunity is available to RFRA claims, or whether Mr. Ajaj plead violations of clearly established law, oral argument is necessary.

*Tanzin* is a landmark decision. With the Court holding that RFRA permits damages against public officials in their individual capacities, the next logical question is whether those individual capacity defendants may use qualified immunity as a defense. This is an important question for *Tanzin*'s progeny. This Court, should it arrive at the question, will undoubtably set important precedent. Oral argument will help the Court address this important and novel question.

Dated: January 20, 2021

Respectfully submitted,

STUDENT LAW OFFICE

*s/ Katie Heideman*
Katie Heideman

*s/ Zoë Williams*
Zoë Williams

*s/ Nicole B. Godfrey*
Nicole B. Godfrey

*s/ Laura Rovner*
Laura Rovner
University of Denver College of Law
Civil Rights Clinic
2255 East Evans Avenue, Suite 335
Denver, Colorado 80208
(303) 871-6155
ngodfrey@law.du.edu

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the Length Limits requirement of this Court's Order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X] this document contains 3,935 words, or
    [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: January 20, 2021

*s/ Nicole B. Godfrey*

Nicole B. Godfrey

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2020, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Matthew Callahan: matthew@muslimadvocates.org, docket@muslimadvocates.org

Micah Aaron Chavin: micah.chavin@dlapiper.com, selena.paradee@dlapiper.com, micah-chavin-2843@ecf.pacerpro.com

John J. Clarke, Jr: john.clarke@dlapiper.com

Caroline A. Fish: caroline.fish@dlapiper.com

Sean Allen Newland: sean.newland@dlapiper.com, sean-newland-2297@ecf.pacerpro.com

Susan Begesse Prose: susan.prose@usdoj.gov, annette.dolce@usdoj.gov, usaco.ecfappellate@usdoj.gov

Karl L. Schock: karl.schock@usdoj.gov, usaco.ecfappellate@usdoj.gov

Lowell Sturgill, Jr: Lowell.sturgill@usdoj.gov


Date: January 20, 2021


*s/ Nicole B. Godfrey*
Nicole B. Godfrey

*Counsel for Plaintiff-Appellant*
2255 East Evans Ave. Ste. 335
Denver, CO 80208
ngodfrey@law.du.edu
303-871-6574

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender and Crowdstrike, and according to the programs are free of viruses.

Date: January 20, 2021

*s/ Nicole B. Godfrey*
Nicole B. Godfrey

*Counsel for Plaintiff-Appellant*

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TANZIN ET AL. *v.* TANVIR ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 19–71.   Argued October 6, 2020—Decided December 10, 2020

The Religious Freedom Restoration Act of 1993 (RFRA) was enacted in the wake of *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, to provide a remedy to redress Federal Government violations of the right to free exercise under the First Amendment. Respondents are practicing Muslims who sued under RFRA, claiming that federal agents placed them on the No Fly List for refusing to act as informants against their religious communities. They sought injunctive relief against the agents in their official capacities and monetary damages against the agents in their individual capacities. As relevant here, the District Court found that RFRA does not permit monetary relief and dismissed their individual-capacity claims. The Second Circuit reversed, holding that RFRA's remedies provision encompasses money damages against Government officials.

*Held*: RFRA's express remedies provision permits litigants, when appropriate, to obtain money damages against federal officials in their individual capacities. Pp. 3–9.

(a) RFRA's text provides that persons may sue and "obtain appropriate relief against a government," 42 U. S. C. §2000bb–1(c), including an "official (or other person acting under color of law) of the United States," §2000bb–2(1). RFRA supplants the ordinary meaning of "government" with a different, express definition that includes "official[s]." It then underscores that "official[s]" are "person[s]." Under RFRA's definition, relief that can be executed against an "official . . . of the Unites States" *is* "relief against a government." This reading is confirmed by RFRA's use of the phrase "persons acting under color of law," which has long been interpreted by this Court in the 42 U. S. C. §1983 context to permit suits against officials in their individual capacities. See, *e.g., Memphis Community School Dist.* v. *Stachura,* 477 U. S. 299,

305–306. Pp. 3–5.

(b) RFRA's term "appropriate relief" is "open-ended" on its face; thus, what relief is " 'appropriate' " is "inherently context dependent." *Sossamon* v. *Texas,* 563 U. S. 277, 286. In the context of suits against Government officials, damages have long been awarded as appropriate relief, and though more limited today, they remain an appropriate form of relief. The availability of damages under §1983 is particularly salient here. When Congress first enacted RFRA, the definition of "government" included state and local officials. In order to reinstate the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim, §2000bb(b), the remedies provision must have encompassed at least the same forms of relief authorized by §1983. Because damages claims have always been available under §1983 for clearly established violations of the First Amendment, that means RFRA provides, as one avenue for relief, a right to seek damages against Government employees. The presumption in *Sossamon*, 563 U. S. 277, is inapplicable because this case does not involve sovereign immunity. Pp. 5–9.

894 F. 3d 449, affirmed.

THOMAS, J., delivered the opinion of the Court, in which all other Members joined, except BARRETT, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–71
_____

## FNU TANZIN, ET AL., PETITIONERS *v.* MUHAMMAD TANVIR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[December 10, 2020]

JUSTICE THOMAS delivered the opinion of the Court.

The Religious Freedom Restoration Act of 1993 (RFRA) prohibits the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means. 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.* It also gives a person whose religious exercise has been unlawfully burdened the right to seek "appropriate relief." The question here is whether "appropriate relief" includes claims for money damages against Government officials in their individual capacities. We hold that it does.

I

A

RFRA secures Congress' view of the right to free exercise under the First Amendment, and it provides a remedy to redress violations of that right. Congress passed the Act in the wake of this Court's decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 885–890 (1990), which held that the First Amendment tolerates neutral, generally applicable laws that burden or prohibit

religious acts even when the laws are unsupported by a nar-
rowly tailored, compelling governmental interest.    See
§2000bb(a).  RFRA sought to counter the effect of that hold-
ing and restore the pre-*Smith* "compelling interest test" by
"provid[ing] a claim . . . to persons whose religious exercise
is substantially burdened by government."  §§2000bb(b)(1)–
(2).  That right of action enables a person to "obtain appro-
priate relief against a government."  §2000bb–1(c).  A "'gov-
ernment'" is defined to include "a branch, department,
agency, instrumentality, and official (or other person acting
under color of law) of the United States."  §2000bb–2(1).

### B

Respondents Muhammad Tanvir, Jameel Algibhah, and
Naveed Shinwari are practicing Muslims who claim that
Federal Bureau of Investigation agents placed them on the
No Fly List in retaliation for their refusal to act as inform-
ants against their religious communities.  Respondents
sued various agents in their official capacities, seeking re-
moval from the No Fly List.  They also sued the agents in
their individual capacities for money damages.  According
to respondents, the retaliation cost them substantial sums
of money: airline tickets wasted and income from job oppor-
tunities lost.

More than a year after respondents sued, the Department
of Homeland Security informed them that they could now
fly, thus mooting the claims for injunctive relief.  The Dis-
trict Court then dismissed the individual-capacity claims
for money damages, ruling that RFRA does not permit mon-
etary relief.

The Second Circuit reversed.  894 F. 3d 449 (2018).  It
determined that RFRA's express remedies provision, com-
bined with the statutory definition of "Government," au-
thorizes claims against federal officials in their individual
capacities. Relying on our precedent and RFRA's broad pro-
tections for religious liberty, the court concluded that the

27

open-ended phrase "appropriate relief" encompasses money damages against officials. We granted certiorari, 589 U. S. ___ (2019), and now affirm.

## II

As usual, we start with the statutory text. *E.g., Mission Product Holdings, Inc.* v. *Tempnology, LLC*, 587 U. S. ___, ___ (2019) (slip op., at 8). A person whose exercise of religion has been unlawfully burdened may "obtain appropriate relief against a government." 42 U. S. C. §2000bb–1(c).

### A

We first have to determine if injured parties can sue Government officials in their personal capacities. RFRA's text provides a clear answer: They can. Persons may sue and obtain relief "against a government," §2000bb–1(c), which is defined to include "a branch, department, agency, instrumentality, and *official* (*or other person acting under color of law*) of the United States." §2000bb–2(1) (emphasis added).

The Government urges us to limit lawsuits against officials to suits against them in their official, not personal, capacities. A lawsuit seeking damages from employees in their individual capacities, the Government argues, is not really "against a government" because relief "can be executed only against the official's personal assets." *Kentucky* v. *Graham*, 473 U. S. 159, 166 (1985).

The problem with this otherwise plausible argument is that Congress supplanted the ordinary meaning of "government" with a different, express definition. "'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. ___, ___ (slip op., at 9) (quoting *Burgess* v. *United States*, 553 U. S. 124, 130 (2008)). For example, if a statute defines a "State" to include territories and districts, that addition to the plain meaning controls. See, *e.g.,* 15 U. S. C. §267. So too here.

A "government," under RFRA, extends beyond the term's plain meaning to include officials. And the term "official" does not refer solely to an office, but rather to the actual person "who is invested with an office." 10 Oxford English Dictionary 733 (2d ed. 1989). Under RFRA's definition, relief that can be executed against an "official . . . of the United States" *is* "relief against a government." 42 U. S. C. §§2000bb–1(c), 2000bb–2(1).

Not only does the term "government" encompass officials, it also authorizes suits against "other person[s] acting under color of law." §2000bb–2(1). The right to obtain relief against "a person" cannot be squared with the Government's reading that relief must always run against the United States. Moreover, the use of the phrase "official (*or other* person . . . )" underscores that "official[s]" are treated like "person[s]." *Ibid.* (emphasis added). In other words, the parenthetical clarifies that "a government" includes both individuals who are officials acting under color of law *and* other, additional individuals who are nonofficials acting under color of law. Here, respondents sued the former.

The legal "backdrop against which Congress enacted" RFRA confirms the propriety of individual-capacity suits. *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 487 (2005). The phrase "persons acting under color of law" draws on one of the most well-known civil rights statutes: 42 U. S. C. §1983. That statute applies to "person[s] . . . under color of any statute," and this Court has long interpreted it to permit suits against officials in their individual capacities. See, *e.g., Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 305–306, and n. 8 (1986). Because RFRA uses the same terminology as §1983 in the very same field of civil rights law, "it is reasonable to believe that the terminology bears a consistent meaning." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 323 (2012). A suit against an official in his personal capacity is a suit against a person acting under color of law. And a suit

against a person acting under color of law is a suit against "a government," as defined under RFRA. §2000bb–1(c).

B

The question then becomes what "appropriate relief" entails. Without a statutory definition, we turn to the phrase's plain meaning at the time of enactment. See *FCC* v. *AT&T Inc.*, 562 U. S. 397, 403 (2011). "Appropriate" means "[s]pecially fitted or suitable, proper." 1 Oxford English Dictionary, at 586; see also Merriam-Webster's Collegiate Dictionary 57 (10th ed. 1996) ("especially suitable or compatible"). Because this language is "open-ended" on its face, what relief is "'appropriate'" is "inherently context dependent." *Sossamon* v. *Texas*, 563 U. S. 277, 286 (2011) (interpreting identical language).

In the context of suits against Government officials, damages have long been awarded as appropriate relief. In the early Republic, "an array of writs . . . allowed individuals to test the legality of government conduct by filing suit against government officials" for money damages "payable by the officer." Pfander & Hunt, Public Wrongs and Private Bills: Indemnification and Govt Accountability in the Early Republic, 85 N. Y. U. L. Rev. 1862, 1871–1875 (2010); see *id.*, at 1875, n. 52 (collecting cases). These common-law causes of action remained available through the 19th century and into the 20th. See, *e.g.*, *Little* v. *Barreme*, 2 Cranch 170 (1804); *Elliott* v. *Swartwout*, 10 Pet. 137 (1836); *Mitchell* v. *Harmony*, 13 How. 115 (1852); *Buck* v. *Colbath*, 3 Wall. 334 (1866); *Belknap* v. *Schild*, 161 U. S. 10 (1896); *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 619–620 (1912) ("The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded").

Though more limited, damages against federal officials remain an appropriate form of relief today. In 1988 the Westfall Act foreclosed common-law claims for damages

against federal officials, 28 U. S. C. §2679, but it left open claims for constitutional violations and certain statutory violations. §§2679(b)(2)(A)–(B). Indeed, the Act expressly contemplates that a statute could authorize an action for damages against Government employees. §2679(b)(2)(B) (explaining that the displacement of remedies "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized").

Damages are also commonly available against state and local government officials. In 1871, for example, Congress passed the precursor to §1983, imposing liability on any person who, under color of state law, deprived another of a constitutional right. 17 Stat. 13; see also *Myers* v. *Anderson*, 238 U. S. 368, 379, 383 (1915) (affirming award of damages against state election officials). By the time Congress enacted RFRA, this Court had interpreted the modern version of §1983 to permit monetary recovery against officials who violated "clearly established" federal law. *E.g., Procunier* v. *Navarette*, 434 U. S. 555, 561–562 (1978); *Siegert* v. *Gilley*, 500 U. S. 226, 231 (1991).

This availability of damages under §1983 is particularly salient in light of RFRA's origins. When first enacted, RFRA defined "'government'" to include an "official (or other person acting under color of law) of the United States, *a State, or a subdivision of a State*." 107 Stat. 1489 (emphasis added). It made no distinction between state and federal officials. After this Court held that RFRA could not be enforced against the States, see *City of Boerne* v. *Flores*, 521 U. S. 507, 511 (1997), Congress narrowly amended the definition "by striking 'a State, or a subdivision of a State.'" 114 Stat. 806. That context is important because RFRA made clear that it was reinstating both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim. §2000bb(b).

31

There is no doubt that damages claims have always been available under §1983 for clearly established violations of the First Amendment. See, *e.g., Sause* v. *Bauer*, 585 U. S. ___ (2018) (*per curiam*) (reversing grant of qualified immunity in a case seeking damages under §1983 based on alleged violations of free exercise rights and Fourth Amendment rights); *Murphy* v. *Missouri Dept. of Corrections*, 814 F. 2d 1252, 1259 (CA8 1987) (remanding to enter judgment for plaintiffs on a §1983 free speech and free exercise claims and to determine and order "appropriate relief, which . . . may, if appropriate, include an award" of damages).  Given that RFRA reinstated pre-*Smith* protections and rights, parties suing under RFRA must have at least the same avenues for relief against officials that they would have had before *Smith*.  That means RFRA provides, as one avenue for relief, a right to seek damages against Government employees.

A damages remedy is not just "appropriate" relief as viewed through the lens of suits against Government employees.  It is also the *only* form of relief that can remedy some RFRA violations.  For certain injuries, such as respondents' wasted plane tickets, effective relief consists of damages, not an injunction.  See, *e.g.*, *DeMarco* v. *Davis*, 914 F. 3d 383, 390 (CA5 2019) (destruction of religious property); *Yang* v. *Sturner*, 728 F. Supp. 845 (RI 1990), opinion withdrawn 750 F. Supp. 558 (RI 1990) (autopsy of son that violated Hmong beliefs).  Given the textual cues just noted, it would be odd to construe RFRA in a manner that prevents courts from awarding such relief.  Had Congress wished to limit the remedy to that degree, it knew how to do so.  See, *e.g.*, 29 U. S. C. §1132(a)(3) (providing for "appropriate equitable relief"); 42 U. S. C. §2000e–5(g)(1) (providing for "equitable relief as the court deems appropriate"); 15 U. S. C. §78u(d)(5) (providing for "any equitable relief that

may be appropriate or necessary").*

Our opinion in *Sossamon* does not change this analysis. *Sossamon* held that a State's acceptance of federal funding did not waive sovereign immunity to suits for damages under a related statute—the Religious Land Use and Institutionalized Persons Act of 2000—which also permits "'appropriate relief.'" 563 U. S., at 280, 282. The obvious difference is that this case features a suit against individuals, who do not enjoy sovereign immunity.

The Government also posits that we should be wary of damages against government officials because these awards could raise separation-of-powers concerns. But this exact remedy has coexisted with our constitutional system since the dawn of the Republic. To be sure, there may be policy reasons why Congress may wish to shield Government employees from personal liability, and Congress is free to do so. But there are no constitutional reasons why we must do so in its stead.

To the extent the Government asks us to create a new policy-based presumption against damages against individual officials, we are not at liberty to do so. Congress is best suited to create such a policy. Our task is simply to interpret the law as an ordinary person would. Although background presumptions can inform the understanding of a word or phrase, those presumptions must exist at the time of enactment. We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted 27 years ago.

---

*Both the Government and respondents agree that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA. Indeed, respondents emphasize that the "qualified immunity defense was created for precisely these circumstances," Brief for Respondents 22, and is a "powerful shield" that "protects all but the plainly incompetent or those who flout clearly established law," Tr. of Oral Arg. 42; see *District of Columbia* v. *Wesby*, 583 U. S. ___, ___–___ (2018) (slip op., at 13–15).

*     *     *

We conclude that RFRA's express remedies provision permits litigants, when appropriate, to obtain money damages against federal officials in their individual capacities.  The judgment of the United States Court of Appeals for the Second Circuit is affirmed.

*It is so ordered.*

JUSTICE BARRETT took no part in the consideration or decision of this case.

No. 19-71

# In the Supreme Court of the United States

---

FNU TANZIN, ET AL., PETITIONERS

*v.*

MUHAMMAD TANVIR, ET AL.

---

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE PETITIONERS**

---

NOEL J. FRANCISCO
  *Solicitor General
    Counsel of Record*
JOSEPH H. HUNT
  *Assistant Attorney General*
JEFFREY B. WALL
EDWIN S. KNEEDLER
  *Deputy Solicitors General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney
  General*
AUSTIN L. RAYNOR
  *Assistant to the Solicitor
  General*
BENJAMIN H. TORRANCE
SARAH S. NORMAND
ELLEN BLAIN
MARY HAMPTON MASON
REGINALD M. SKINNER
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTION PRESENTED**

Whether the Religious Freedom Restoration Act of 1993, 42 U.S.C. 2000bb *et seq.*, authorizes suits seeking money damages against individual federal employees.

## PARTIES TO THE PROCEEDING

Petitioners were the appellees in the court of appeals. They are First Name Unknown (FNU) Tanzin, Sanya Garcia, John Last Name Unknown (LNU), Francisco Artusa, John C. Harley III, Steven LNU, Michael LNU, and Gregg Grossoehmig, alleged Special Agents of the Federal Bureau of Investigation (FBI); Weysan Dun, alleged Special Agent in Charge, FBI; James C. Langenberg, alleged Assistant Special Agent in Charge, FBI; and five John Does, alleged Special Agents, FBI.

Respondents were the appellants in the court of appeals. They are Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari.[*]

---

[*] As specified above, the pleadings named several defendants as FNU, LNU, or anonymously as John Does. Br. in Opp. App. 1a, 6a-12a. The pleadings list six John Doe Special Agents of the FBI, but John Does 2 and 3 have been determined to be the same person. Pet. App. 64a n.1. Nine other named or unnamed alleged FBI Special Agents, as well as the Attorney General of the United States, the Director of the FBI, the Director of the Terrorist Screening Center, and the Secretary of Homeland Security were defendants in the district court but did not appear in the court of appeals. Awais Sajjad was a plaintiff in the district court but did not appear in the court of appeals. See *id.* at 1a, 62a.

**TABLE OF CONTENTS**

Page

Opinions below ............................................................. 1
Jurisdiction .................................................................. 1
Statutory provisions involved ...................................... 2
Statement .................................................................... 3
Summary of argument ................................................. 13
Argument:
    RFRA does not authorize damages awards against
    federal officials in their personal capacities ...................... 17
    A.  Damages awards are not "appropriate relief" in
        RFRA suits against individual federal officials ........... 17
        1.  The broader statutory language makes clear
            that damages awards against federal officials in
            their personal capacities are not "appropriate
            relief" ...................................................................... 18
        2.  Congress did not intend to impose personal
            liability on individual federal officials through a
            novel damages remedy in RFRA ............................ 20
        3.  Damages awards against federal officials in
            their personal capacities are not appropriate
            relief unless Congress clearly indicates that
            they are ................................................................... 26
        4.  This Court has held that damages are not
            "appropriate relief" under RFRA's companion
            statute, RLUIPA ..................................................... 35
    B.  The counterarguments lack merit ................................ 38
        1.  RFRA's definition of "government" does not
            render damages awards against individual
            federal officials in their personal capacities
            "appropriate relief against a government" ............ 39
        2.  *Franklin* does not require a presumption in
            favor of personal damages awards against
            federal officials under RFRA ................................. 44
Conclusion ................................................................... 49
Appendix — Statutory provisions ............................... 1a

## TABLE OF AUTHORITIES

Cases:                                                                    Page

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) ............... 13, 24, 32, 33

*Atwater* v. *City of Lago Vista*, 532 U.S. 318 (2001) ....... 33

*Barr* v. *Matteo*, 360 U.S. 564 (1959) ............................... 31, 33

*Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ............. 7, 14, 21

*Branch* v. *Smith*, 538 U.S. 254 (2003) ............................ 20, 22

*Brentwood Acad.* v. *Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ..................... 41

*Bush* v. *Lucas*, 462 U.S. 367 (1983) ................................. 22

*Caldwell* v. *Miller*, 790 F.2d 589 (7th Cir. 1986) ................ 25

*Cannon* v. *University of Chicago*, 441 U.S. 677 (1979) ..... 44

*Carlson* v. *Green*, 446 U.S. 14 (1980) .................................. 21

*Centro Familiar Cristano Buenas Nuevas* v. *City of Yuma*, 651 F.3d 1163 (9th Cir. 2011) .................... 38

*Chappell* v. *Wallace*, 462 U.S. 296 ....................................... 22

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520 (1993) ............................. 31

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ................. 5, 35

*City of Escondido* v. *Emmons*, 139 S. Ct. 500 (2019) ............................................................. 34

*City of Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) ................................. 28

*Clark* v. *Martinez*, 543 U.S. 371 (2005) ........................ 42, 47

*Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61 (2001) ............................................................. 24

*Curtis* v. *Loether*, 415 U.S. 189 (1974) ............................ 28

*Davila* v. *Gladden*, 777 F.3d 1198 (11th Cir.), cert. denied, 136 S. Ct. 78 (2015) ...................... 19

*Davis* v. *Passman*, 442 U.S. 228 (1979) ............................... 21

Cases—Continued:                                                   Page

*Employment Div.* v. *Smith*, 494 U.S. 872
  (1990)..............................................................3, 4, 14, 20, 23

*Fiallo* v. *Bell*, 430 U.S. 787 (1977)........................................ 32

*Franklin* v. *Gwinnett Cnty. Pub. Sch.*,
  503 U.S. 60 (1992) ...................................................... *passim*

*Gonzales* v. *O Centro Espirita Beneficente Uniao do
  Vegetal*, 546 U.S. 418 (2006)................................................ 36

*Gustafson* v. *Alloyd Co.*, 513 U.S. 561 (1995).................. 42

*Gutierrez de Martinez* v. *Lamagno*, 515 U.S. 417
  (1995) ......................................................................... 27

*Haig* v. *Agee*, 453 U.S. 280 (1981) ........................................ 32

*Haight* v. *Thompson*, 763 F.3d 554 (6th Cir. 2014)...... 38, 47

*Hale* v. *Federal Bureau of Prisons*, 759 Fed. Appx.
  741 (10th Cir.), cert. denied, 140 S. Ct. 196 (2019) .......... 19

*Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982)......................... 33

*Holt* v. *Hobbs*, 574 U.S. 352 (2015)...................................... 36

*Jihaad* v. *O'Brien*, 645 F.2d 556 (6th Cir. 1981)........... 25, 26

*Johnson* v. *United States*, 559 U.S. 133 (2010).................. 39

*Kashem* v. *Barr*, 941 F.3d 358 (9th Cir. 2019) ................... 32

*Kentucky* v. *Graham*, 473 U.S. 159 (1985).......................... 18

*Larson* v. *Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949).....................................................40, 41

*Leocal* v. *Ashcroft*, 543 U.S. 1 (2004) .................................. 39

*Lewis* v. *Clarke*, 137 S. Ct. 1285 (2017)............................... 40

*Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922 (1982) ........... 41

*Mack* v. *O'Leary*, 80 F.3d 1175 (7th Cir. 1996),
  vacated on other grounds and remanded,
  522 U.S. 801 (1997)................................................................ 8

*Mack* v. *Warden Loretto FCI*, 839 F.3d 286
  (3d Cir. 2016) ........................................................................ 28

*Milner* v. *Department of the Navy*, 562 U.S. 562
  (2011)....................................................................................... 25

Cases—Continued:                                        Page

*Nelson* v. *Miller*, 570 F.3d 868 (7th Cir. 2009) .................. 38

*Nieves* v. *Bartlett*, 139 S. Ct. 1715 (2019) ........................... 31

*Oklevueha Native Am. Church of Haw., Inc.* v.
    *Holder*, 676 F.3d 829 (9th Cir. 2012).................................. 19

*Reichle* v. *Howards*, 566 U.S. 658 (2012)............................. 24

*Rendelman* v. *Rouse*, 569 F.3d 182 (4th Cir. 2009)........... 37

*Richardson* v. *McKnight*, 521 U.S. 399 (1997) .................. 41

*Schweiker* v. *Chilicky*, 487 U.S. 412 (1988)................... 22, 34

*Sharp* v. *Johnson*, 669 F.3d 144 (3d Cir.),
    cert. denied, 567 U.S. 937 (2012) ....................................... 37

*Sherbert* v. *Verner*, 374 U.S. 398 (1963)................................ 4

*Smith* v. *Allen*, 502 F.3d 1255 (11th Cir. 2007),
    abrogated on other grounds by *Sossamon* v. *Texas*,
    563 U.S. 277 (2011)............................................................. 38

*Sossamon* v. *Lone Star State of Tex.*, 560 F.3d 316
    (5th Cir. 2009), aff'd, 563 U.S. 277 (2011) ........................ 37

*Sossamon* v. *Texas*, 563 U.S. 277 (2011) .................... *passim*

*Stafford* v. *Briggs,* 444 U.S. 527 (1980)......................... 43, 44

*Stewart* v. *Beach*, 701 F.3d 1322 (10th Cir. 2012)............... 38

*Tenney* v. *Brandhove*, 341 U.S. 367 (1951) ......................... 30

*Thomas* v. *Review Bd. of the Ind. Emp't Sec.*
    *Div.*, 450 U.S. 707 (1981) ..................................................... 31

*Trinity Lutheran Church of Columbia, Inc.* v.
    *Comer*, 137 S. Ct. 2012 (2017) ............................................ 25

*Turkmen* v. *Hasty*, 789 F.3d 218 (2d Cir. 2015),
    rev'd in part and vacated in part on other grounds
    *sub nom. Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017)............. 7

*United States* v. *Bergh*, 352 U.S. 40 (1956) ........................ 38

*United States* v. *Doe*, 960 F.2d 221 (1st Cir. 1992)............. 40

*United States* v. *Morton*, 467 U.S. 822 (1984) .................... 18

*United States* v. *Stanley*, 483 U.S. 669 (1987) ..........22, 33

Cases—Continued:                                                           Page

*Washington* v. *Gonyea*, 731 F.3d 143
    (2d Cir. 2013) ........................................................................ 37

*Washington State Dep't of Soc. & Health Servs.* v.
    *Guardianship Estate of Keffeler*, 537 U.S. 371
    (2003) ..................................................................................... 42

*Webman* v. *Federal Bureau of Prisons*,
    441 F.3d 1022 (D.C. Cir. 2006) ........................................... 19

*West* v. *Gibson*, 527 U.S. 212 (1999) ...................................... 24

*Westfall* v. *Erwin*, 484 U.S. 292 (1988) ........................... 27

*Wilkie* v. *Robbins*, 551 U.S. 537 (2007) ................................ 35

*Wood* v. *Yordy*, 753 F.3d 899 (9th Cir. 2014) ...................... 38

*Yiamouyiannis* v. *Chemical Abstracts Serv.*,
    521 F.2d 1392 (6th Cir. 1975), remanded,
    578 F.2d 164 (6th Cir. 1978), cert. denied,
    439 U.S. 983 (1978) ............................................................... 26

*Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017) .................... *passim*

Constitution, statutes, and regulations:

U.S. Const.:
    Art. I, § 8:
        Cl. 1 (Spending Clause) ................................. 36, 37, 47
        Cl. 3 (Commerce Clause) ..................................... 36, 47
    Art. II ................................................................................ 32
    Amend. I (Free Exercise Clause) ........................ *passim*
    Amend. IV ....................................................................... 21
    Amend. V (Due Process Clause) ........................ 6, 21, 25
    Amend. VIII .................................................................... 21
    Amend. XIV .................................................................... 36
Administrative Procedure Act, 5 U.S.C. 701 *et seq.* ............. 6
    5 U.S.C. 702 (1976) ........................................................ 21
    5 U.S.C. 704 (1976) ........................................................ 21

Statutes and regulations—Continued:                    Page

Education Amendments of 1972, Tit. IX,
    20 U.S.C. 1681 *et seq.* ............................................................ 44
Federal Employees Liability Reform and Tort
    Compensation Act of 1988, Pub. L. No. 100-694,
    § 2(a)(5), 102 Stat. 4563 ...................................................... 27
Religious Freedom Restoration Act of 1993,
    42 U.S.C. 2000bb *et seq.* ............................................... 3, 1a
        42 U.S.C. 2000bb(a)(5) ...................................................... 4
        42 U.S.C. 2000bb(b) ................................................... 23, 1a
        42 U.S.C. 2000bb(b)(1) ........................................... 4, 8, 1a
        42 U.S.C. 2000bb(b)(2) ............................................. 4, 2a
        42 U.S.C. 2000bb-1 .............................................. 2, 19, 2a
        42 U.S.C. 2000bb-1(a) ......................... 2, 4, 31, 38, 42, 2a
        42 U.S.C. 2000bb-1(b) ......................... 2, 4, 34, 38, 42, 2a
        42 U.S.C. 2000bb-1(c) ......................................... *passim*, 2a
        42 U.S.C. 2000bb-2(1) (Supp. V 1993) ......................... 35
        42 U.S.C. 2000bb-2(1) ......................................... *passim*, 3a
        42 U.S.C. 2000bb-2(2) ........................................................ 5
Religious Land Use and Institutionalized Persons
    Act of 2000, 42 U.S.C. 2000cc *et seq.* ................................. 7
        42 U.S.C. 2000cc-2(a) .................................................. 36, 46
        42 U.S.C. 2000cc-5(4)(A)(ii)-(iii) .................................... 36
18 U.S.C. 2520(b)(2) ................................................................. 27
28 U.S.C. 1391(e) (1970) ......................................................... 43
42 U.S.C. 1983 .................................................. 11, 12, 28, 29
42 U.S.C. 1985(3) ..................................................................... 27
42 U.S.C. 2000d-7(a)(2) ........................................................ 48
47 U.S.C. 605(e)(3)(B)(ii) ........................................................ 27
49 U.S.C. 44903(j)(2) ............................................................... 7
49 U.S.C. 44909(c)(6) ............................................................... 7

Statutes and regulations—Continued:                    Page

    49 U.S.C. 44926(a) ................................................................ 7
    50 U.S.C. 1810(a) ................................................................ 27
    50 U.S.C. 1810(b) ................................................................ 27
    49 C.F.R. 1560.201-1560.207 ................................................ 7

Miscellaneous:

    H.R. 5377, 101st Cong., 2d Sess. (1990).............................. 46
    H.R. Rep. No. 1936, 86th Cong., 2d Sess. (1960)............... 43
    H.R. Rep. No. 88, 103d Cong., 1st Sess. (1993) ................. 23
    John F. Manning, *What Divides Textualists From
       Purposivists?*, 106 Colum. L. Rev. 70 (2006) ................. 22
    S. Rep. No. 111, 103d Cong., 1st Sess. (1993) ................... 23

# In the Supreme Court of the United States

———

No. 19-71

FNU TANZIN, ET AL., PETITIONERS

*v.*

MUHAMMAD TANVIR, ET AL.

———

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———

**BRIEF FOR THE PETITIONERS**

———

### OPINIONS BELOW

The amended opinion of the court of appeals (Pet. App. 1a-44a) is reported at 894 F.3d 449. The order of the court of appeals denying rehearing en banc (Pet. App. 45a-61a) is reported at 915 F.3d 898. The opinion and order of the district court (Pet. App. 62a-109a) is reported at 128 F. Supp. 3d 756. Subsequent orders of the district court (Pet. App. 110a-112a, 113a-114a) are unreported.

### JURISDICTION

The amended judgment of the court of appeals was entered on June 25, 2018. A petition for rehearing was denied on February 14, 2019 (Pet. App. 45a-61a). On May 8, 2019, Justice Ginsburg extended the time within which to file a petition for a writ of certiorari to and including June 14, 2019. On June 4, 2019, Justice Ginsburg further extended the time to and including July 14,

2019, and the petition was filed on July 12, 2019. The petition for a writ of certiorari was granted on November 22, 2019. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### STATUTORY PROVISIONS INVOLVED

42 U.S.C. 2000bb-1 provides:

**(a)  In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b)  Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

**(c)  Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. 2000bb-2(1) provides:

As used in this chapter—

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity[.]

Other relevant statutory provisions are reprinted in an appendix to this brief. App., *infra*, 1a-4a.

## STATEMENT

This case involves the nature of the relief authorized under the Religious Freedom Restoration Act of 1993 (RFRA or Act), 42 U.S.C. 2000bb *et seq.*, which provides that a prevailing person may obtain "appropriate relief against a government" when the government has substantially burdened the person's religious exercise without meeting certain statutory requirements. 42 U.S.C. 2000bb-1(c). Respondents here sued various federal employees in their personal capacities for money damages, alleging violations of RFRA. The district court dismissed the claims, ruling that damages awards against individual federal employees were not "appropriate relief" within the terms of the statute. Pet. App. 107a-108a (citation omitted). The court of appeals reversed, concluding that such awards were appropriate. *Id.* at 23a.

1. RFRA was Congress's response to *Employment Division* v. *Smith*, 494 U.S. 872 (1990). In that case, the respondent claimed a religious exemption under the First Amendment from a state criminal law that prevented him from using peyote in a religious ceremony. *Id.* at 874. This Court rejected the claim, holding that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law

of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879 (citation and internal quotation marks omitted). In reaching that conclusion, the Court rejected an earlier line of precedents holding that even nondiscriminatory "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." *Id.* at 883; see, *e.g.*, *Sherbert* v. *Verner*, 374 U.S. 398 (1963).

In Congress's view, however, "the compelling interest test as set forth in [pre-*Smith*] Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. 2000bb(a)(5). Congress thus described RFRA's purposes as twofold: "to restore the compelling interest test" that had been used before *Smith* and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. 2000bb(b)(1) and (2).

RFRA accordingly provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless that burden is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. 2000bb-1(a) and (b). The Act further provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. 2000bb-1(c). "'[G]overnment,'" in turn, is currently defined to "include[] a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States"

or of a specified federal "'covered entity.'"  42 U.S.C. 2000bb-2(1) and (2);[1] see *City of Boerne* v. *Flores*, 521 U.S. 507, 532 (1997) (invalidating Congress's inclusion of States within RFRA's original definition of "government").  RFRA does not expressly define the phrase "appropriate relief."

2.  All three respondents immigrated to the United States and are now either U.S. citizens or lawful permanent residents.  Pet. App. 3a.  Each is Muslim.  During the relevant period (approximately 2007-2013, see Br. in Opp. App. 23a, 36a, 37a, 45a, 47a, 55a), petitioners were allegedly agents of the Federal Bureau of Investigation (FBI).  Respondents allege that petitioners, in the course of conducting investigations related to national security, asked them various questions about their backgrounds, acquaintances, and activities.  *Id.* at 23a-25a, 37a-38a, 42a.  They further allege that petitioners asked them to serve as informants for the government in terrorism-related investigations, but that respondents refused, at least in part based on their religious beliefs.  Pet. App. 3a.  Respondents do not allege that they informed any of the agents that their refusal was based on religious grounds.  See *id.* at 58a (Jacobs, J., dissenting from the denial of rehearing en banc).  Rather, one respondent allegedly told the agents "that he needed time to consider their request," Br. in Opp. App. 42a-43a, while the others allegedly objected that serving as an informant would be too "dangerous," *id.* at 26a, 53a.

---

[1]  The term "'covered entity'" means "the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States."  42 U.S.C. 2000bb-2(2).

Respondents assert that petitioners retaliated against them for refusing to serve as informants by improperly placing or retaining them on the No Fly List—a government-maintained list of persons known or suspected of posing a risk of terrorism and therefore barred from boarding commercial aircraft in the United States. Pet. App. 5a-6a. Thus, according to respondents, petitioners substantially burdened their religious exercise by forcing them "into an impermissible choice between, on the one hand, obeying their sincerely held religious beliefs and being subjected to * * * placement or retention on the No Fly List, or, on the other hand, violating their sincerely held religious beliefs in order to avoid being placed on the No Fly List or to secure removal from the No Fly List." *Id.* at 4a (citation omitted); Br. in Opp. App. 71a. Respondents acknowledge, however, that only relevant agencies, and not individual FBI agents, have the authority to determine the composition of the No Fly List. See Pet. App. 5a; Br. in Opp. App. 9a-10a.

3. Respondents sued, alleging violations of their rights under the First and Fifth Amendments, RFRA, and the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.* Pet. App. 11a; see *id.* at 12a. Respondents sought injunctive relief against petitioners in their official capacities, as well as damages in their personal capacities.

While the government's motion to dismiss was pending, all three respondents took advantage of the administrative redress procedures available to challenge their

alleged placement on the No Fly List.[2] The Department of Homeland Security subsequently advised respondents that it "knows of no reason [they] should be unable to fly," and that their administrative inquiries were closed. Pet. App. 75a-76a (citation omitted). After confirming that they were able to fly, respondents agreed to dismiss their official-capacity claims for injunctive relief without prejudice. See *id.* at 112a.

With respect to respondents' damages claims against petitioners in their personal capacities, the district court first held that respondents had failed to state a claim for an implied right of action under the First Amendment pursuant to *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Pet. App. 79a-94a; see *Turkmen* v. *Hasty*, 789 F.3d 218, 236 (2d Cir. 2015), rev'd in part and vacated in part on other grounds *sub nom. Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017). Respondents did not appeal that determination.

Second, the district court dismissed respondents' RFRA claims for damages. Pet. App. 94a-108a. It began by noting that this Court in *Sossamon* v. *Texas*, 563 U.S. 277 (2011), had held that the phrase "appropriate relief" in RFRA's companion statute, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc *et seq.*, does not authorize money damages against a State. Pet. App. 95a-96a. In

---

[2] The Department of Homeland Security Traveler Redress Inquiry Program enables travelers to request the correction of erroneous information if they allege, *inter alia*, that they have been unfairly or incorrectly delayed in, or prohibited from, boarding an aircraft as a result of a watch list. See 49 U.S.C. 44903(j)(2), 44909(c)(6), 44926(a); 49 C.F.R. 1560.201-1560.207.

the court's view, *Sossamon* "may counsel caution in concluding that the same term—even one as malleable as 'appropriate relief'—can include damages as applied to one class of defendants but not another." *Id.* at 96a n.19.

The district court further observed that RFRA was designed "to restore the compelling interest test" for free-exercise claims as it had existed before *Smith*, Pet. App. 97a (quoting 42 U.S.C. 2000bb(b)(1)), but "'says very little about remedies'"—making it "'unlikely that Congress intended it to displace the existing remedial system for constitutional violations,'" *id.* at 101a (quoting *Mack* v. *O'Leary*, 80 F.3d 1175, 1181 (7th Cir. 1996), vacated on other grounds and remanded, 522 U.S. 801 (1997)). Prior to *Smith*, the only path for a claimant to obtain damages against a federal official for a free-exercise violation would have been through *Bivens*, and this Court has never recognized a free-exercise *Bivens* claim either before or after *Smith*. *Id.* at 101a-102a. In the court's view, because Congress did not intend to upset this status quo, damages were likewise unavailable under RFRA. *Ibid.*

Finally, the court rejected respondents' reliance on *Franklin* v. *Gwinnett County Public Schools*, 503 U.S. 60 (1992), which they invoked for the proposition that courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Pet. App. 104a (quoting *Franklin*, 503 U.S. at 66). The court observed that *Franklin* interpreted the scope of an implied right of action and thus did not govern the question presented here concerning the scope of an express statutory cause of action, which "must be [answered] using the traditional tools of statutory construction." *Id.* at 105a.

4. The court of appeals reversed the dismissal of respondents' personal-capacity claims for damages under RFRA and remanded for consideration of whether petitioners were entitled to qualified immunity. Pet. App. 1a-44a.

The court of appeals first concluded that RFRA permits personal-capacity claims against federal officers, and not just official-capacity claims. Pet. App. 15a-22a. RFRA authorizes an aggrieved person to "obtain appropriate relief against a government," 42 U.S.C. 2000bb-1(c), and defines "'government'" to "include[]" an "official (or other person acting under color of law)," 42 U.S.C. 2000bb-2(1). Substituting the statutory definition for the defined term, the court reasoned that RFRA authorizes a plaintiff to obtain "appropriate relief" against a federal "official." Pet. App. 19a. Accordingly, in the court's view, RFRA's "plain terms[] authorize[] individual capacity suits against federal officers." *Ibid.*

The court of appeals next determined that the phrase "appropriate relief" encompasses money damages in personal-capacity suits against federal officers. Pet. App. 22a-26a. The court observed that Congress enacted RFRA one year after this Court's decision in *Franklin*, and concluded that because RFRA "includes no express indication that it proscribes the recovery of money damages," the "*Franklin* presumption" renders damages an available remedy against individual federal employees. *Id.* at 24a-26a (brackets and internal quotation marks omitted). It rejected the district court's conclusion that the context in which *Franklin* arose (an implied right of action) affected the analysis. *Id.* at 33a.

The court of appeals recognized that the same phrase—"appropriate relief"—in RLUIPA does not authorize damages against a State. Pet. App. 26a-27a; see *Sossamon*, *supra*. And it further acknowledged that other circuits have ruled that RFRA does not permit damages against the federal government. Pet. App. 26a-28a. The court distinguished those rulings on the ground that they involved sovereign immunity, which is not implicated in suits against individual federal officers in their personal capacities. *Ibid.* The court recognized that its holding meant that the same statutory phrase—"'appropriate relief'"—would authorize damages against certain defendants under RFRA and not others. But it concluded that the word "'appropriate'" is flexible and can "take on different meanings in different settings." *Id.* at 31a (citation omitted).

5. Petitioners sought rehearing en banc, which was denied. Pet. App. 45a-46a. Chief Judge Katzmann and Judge Pooler, both members of the panel, concurred in the denial of rehearing en banc. *Id.* at 47a-50a.[3] Judge Jacobs filed an opinion dissenting from the denial of rehearing en banc, which was joined by Judges Cabranes and Sullivan. *Id.* at 51a-58a. Judge Cabranes also filed a dissenting opinion, which was joined by Judges Jacobs and Sullivan. *Id.* at 59a-61a.

a. In their concurring opinion, Chief Judge Katzmann and Judge Pooler reaffirmed their view that the panel decision properly interpreted RFRA to authorize a damages remedy. They rejected the dissents' argument that the panel had improperly implied a new

[3] The third panel member was Judge Lynch, who as a senior judge could not report his views on the petition for rehearing en banc. See Pet. App. 47a n.1.

*Bivens*-type cause of action, contending that it had instead interpreted "an *express* private right of action with an *express* provision for 'appropriate relief,'" using traditional tools of interpretation. Pet. App. 47a-48a (quoting 42 U.S.C. 2000bb-1(c)).

b. In his dissent from the denial of rehearing en banc, Judge Jacobs concluded that the panel's reasoning "fails as a matter of law and logic and runs counter to clear Supreme Court guidance." Pet. App. 51a. He began by emphasizing that this Court in *Sossamon* had already interpreted the "identical private right of action" in RLUIPA to foreclose damages actions against a State, and that *Sossamon* relied not only on sovereign-immunity considerations but also "the plain meaning of the text." *Id.* at 52a. In particular, *Sossamon* "explained that the phrase 'appropriate relief' takes its meaning from 'context.'" *Ibid.* (quoting *Sossamon*, 563 U.S. at 286). Here, Judge Jacobs explained, the context is clear: "the full phrase is 'appropriate relief against a government,'" and when the government is a defendant, damages are inappropriate. *Id.* at 53a. At bottom, Judge Jacobs found it implausible, since RFRA and RLUIPA "attack the same wrong, in the same way, in the same words," that the phrase "'appropriate relief against a government'" can mean one thing in RFRA and another in RLUIPA. *Ibid.*

In response to the panel's reasoning, Judge Jacobs explained that the inclusion of "'official[s]'" in the Act's definition of "'government'" "tells us nothing about damages" and simply "facilitate[s] injunctive relief" against particular officials. Pet. App. 53a. Judge Jacobs contrasted the language of RFRA with that of 42 U.S.C. 1983, which permits an "action at law" and thus plainly contemplates damages actions. Pet. App. 53a-54a

(quoting 42 U.S.C. 1983). He further observed that "every other federal statute" respondents identified as authorizing damages actions against federal officers in their personal capacities does so expressly, *id.* at 54a (quoting *id.* at 103a), thus underscoring that "[i]f a statute imposes personal damages liability against individual federal officers, one would expect that to be done explicitly, rather than by indirection, hint, or negative pregnant," *id.* at 55a. The absence of any explicit indication to this effect in RFRA's text or legislative history was unsurprising, given its stated purpose of restoring the pre-*Smith* substantive standard for free-exercise claims, rather than expanding the categories of available relief. *Id.* at 55a-56a.

Finally, Judge Jacobs distinguished *Franklin*, which he explained did not create a presumption of the availability of money damages, but instead recognized a presumption of "appropriate" remedies for private rights of action. Pet. App. 56a. By presuming that damages were available, he continued, the panel had "simply beg[ged] the question" of what "'appropriate'" remedies RFRA allows. *Ibid.* In answering that question, Judge Jacobs would have looked to cases like *Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017), which he understood to indicate that damages are not "generally considered appropriate relief against governments and government officials." Pet. App. 56a. Judge Jacobs concluded that by inferring a damages remedy in the absence of clear textual guidance, "[t]he panel has done what the Supreme Court has forbidden: it has created a new *Bivens* cause of action, albeit by another name and by other means." *Id.* at 57a. In so doing, it had disregarded the "'substantial social costs'" that inhere in damages lia-

56

bility for individual officers of the government, including the threat of "federal policy being made (or frozen) by the prospect of impact litigation." *Id.* at 57a-58a (citation omitted).

c. In his dissent from the denial of rehearing en banc, Judge Cabranes similarly criticized the panel decision as "a transparent attempt to evade, if not defy," this Court's precedents admonishing against the extension of *Bivens*-like remedies. Pet. App. 59a. He argued that cases like *Abbasi* and *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), make clear that "damages remedies against government officials are disfavored and should not be recognized absent explicit congressional authorization," due to the "'substantial costs'" they impose. Pet. App. 60a (quoting *Abbasi*, 137 S. Ct. at 1856). In Judge Cabranes' view, RFRA contains no such explicit authorization. *Ibid.*

### SUMMARY OF ARGUMENT

RFRA does not authorize damages awards against federal employees in their personal capacities.

A. RFRA authorizes a prevailing plaintiff to obtain "appropriate relief" in a civil suit against the government for violations thereunder. 42 U.S.C. 2000bb-1(c). As this Court has recognized, "the word 'appropriate' is inherently context dependent." *Sossamon* v. *Texas*, 563 U.S. 277, 286 (2011). Interpreted in light of all relevant context—including the broader statutory language, history, separation-of-powers concerns, and precedent—the phrase "appropriate relief" in RFRA does not encompass a damages remedy against federal employees in their personal capacities, for four reasons.

*First*, placed within the broader statutory context, relief is "appropriate" only if it runs "against a govern-

ment." 42 U.S.C. 2000bb-1(c). But because federal officers and employees would be *personally* responsible for damages awards against them in their personal capacities, such awards are not "against a government" in any meaningful sense. Properly understood, RFRA permits relief against federal officials only in their official capacities.

*Second*, "appropriate relief" must be read against the backdrop of the preexisting rule that damages were generally unavailable against individual federal employees. Before RFRA, the only possible avenue for obtaining such relief would have been through an implied cause of action under *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), but this Court's extant precedents did not recognize such an action under the Free Exercise Clause. Congress enacted RFRA in response to this Court's decision in *Employment Division* v. *Smith*, 494 U.S. 872 (1990)—which changed the prevailing substantive standard under the Free Exercise Clause—and there is no indication in the statute or its legislative history that Congress's mere reversion to the prior substantive standard was also intended to work an avulsive change in the law of remedies by authorizing a novel damages remedy against federal employees in their personal capacities. Accordingly, the statutory phrase "appropriate relief" should not be read to encompass such a remedy.

*Third*, this Court should decline to infer from the vague term "appropriate relief" the existence of a personal-capacity damages remedy against federal employees, in the absence of a clear statement of congressional intent to that effect. Congress speaks clearly when authorizing such a remedy, which imposes heavy

burdens on a coequal Branch; Congress, not the Judiciary, is best situated to assess those burdens and determine whether a damages remedy is in the public interest. See, *e.g.*, *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1856-1858, 1860-1861 (2017). The phrase "appropriate relief," however, does not "clearly identify[] money damages." *Sossamon*, 563 U.S. at 286. Rather than adopt a judgment that Congress itself failed to make, this Court should construe "appropriate relief" to exclude personal-capacity damages awards.

*Fourth*, the phrase "appropriate relief" precludes an award of damages here just as it did in *Sossamon*, *supra*, where this Court construed the identical phrase as it appears in RFRA's sister statute, RLUIPA—which governs state rather than federal entities and officials—to preclude an award of damages against a State. In reaching that conclusion, the Court relied both on traditional tools of statutory interpretation and considerations of sovereign immunity. 563 U.S. at 286-288. The Court should reach the same outcome here, both because the text, and the context that informs its meaning, are the same, and because separation-of-powers concerns apply to imposing a personal damages remedy against federal officers and employees.

B. The reasoning embraced by the court of appeals and respondents does not support a contrary understanding of "appropriate relief." The court of appeals relied heavily on RFRA's definition of the term "'government'" to "include[]" an "official (or other person acting under color of law)." 42 U.S.C. 2000bb-2(1); see Pet. App. 19a. But the definition of "government" does not change the meaning of the phrase "appropriate relief." In any event, RFRA's reference to "official[s]"

simply clarifies that injunctive relief against the government may be entered against individual officials. Injunctive relief against officers in their official capacities, unlike monetary relief against officers in their personal capacities, squares with the overarching statutory requirement that any relief run "against a government." 42 U.S.C. 2000bb-1(c).

The court of appeals also invoked a supposed presumption that money damages are *always* an appropriate form of relief to enforce a cause of action absent a clear indication to the contrary. See Pet. App. 24a-26a. But the case upon which it relied for that proposition, *Franklin* v. *Gwinnett County Public Schools*, 503 U.S. 60 (1992), has no application here. *Franklin* addressed an implied cause of action, and the statutory text was thus necessarily silent on the question of remedies. Adverting to a general presumption that damages are available is inappropriate (and unnecessary) where the statute includes an express cause of action and an express remedies provision. Here, the statute permits "appropriate relief against a government," 42 U.S.C. 2000bb-1(c), and that language is susceptible to interpretation using normal tools of statutory construction. Moreover, *Franklin* did not involve personal damages awards against federal employees, which implicate *sui generis* considerations that preclude the use of any generalized presumption in favor of damages. In any event, even if the *Franklin* presumption did apply, it is overcome in RFRA.

ARGUMENT

## RFRA DOES NOT AUTHORIZE DAMAGES AWARDS AGAINST FEDERAL OFFICIALS IN THEIR PERSONAL CAPACITIES

RFRA's authorization of "appropriate relief," 42 U.S.C. 2000bb-1(c), does not encompass money damages against federal officers and employees in their personal capacities. Construing RFRA's text in light of all relevant context—including the broader statutory language, history, separation-of-powers concerns, and precedent—demonstrates that damages awards are not "appropriate relief" in this setting. The reasoning advanced by the court of appeals and respondents does not warrant a different conclusion. The statutory definition of "government" clarifies that plaintiffs may obtain relief against the government by enjoining its agents, and this Court's precedent does not require courts to presume the availability of personal damages liability against federal employees.

### A. Damages Awards Are Not "Appropriate Relief" In RFRA Suits Against Individual Federal Officials

The traditional tools of textual interpretation show that the phrase "appropriate relief" does not encompass damages awards against federal employees in their personal capacities. 42 U.S.C. 2000bb-1(c). "[T]he word 'appropriate' is inherently context dependent," *Sossamon* v. *Texas*, 563 U.S. 277, 286 (2011), and here the statutory language and history, separation-of-powers principles, and this Court's decision in *Sossamon* all indicate that damages are not appropriate.

61

1. ***The broader statutory language makes clear that damages awards against federal officials in their personal capacities are not "appropriate relief"***

In determining what constitutes "appropriate relief" under RFRA, this Court should draw guidance from the text of the entire provision, which states that prevailing plaintiffs may obtain "appropriate relief *against a government*." 42 U.S.C. 2000bb-1(c) (emphasis added); see *United States* v. *Morton*, 467 U.S. 822, 828 (1984) (noting that "[w]e do not * * * construe statutory phrases in isolation" and stating that the relevant text "must be read in light of the immediately following phrase"). The most natural interpretation of the whole statutory phrase is that the awarded relief must actually run against the government. Damages awards against individual federal employees in their personal capacities—for which the employees, rather than the federal treasury, are responsible—are not "against a government" in any real sense. See *Kentucky* v. *Graham*, 473 U.S. 159, 166 (1985) ("[A]n award of damages against an official in his personal capacity can be executed only against the official's personal assets.").

Although RFRA defines "'government'" to "include[]" an "official (or other person acting under color of law) of the United States," 42 U.S.C. 2000bb-2(1), damages awards against federal officials in their personal capacities, unlike injunctive relief, do not run "against [the] government" and thus are not "appropriate relief." Indeed, read in the context of the preceding terms in the definition of "'government'"—"branch, department, agency, [and] instrumentality," *ibid.*—"official" is properly understood to refer to an "official" only in his or her *official capacity*. That is plainly true for

all of the governmental entities that precede "official" in the definition.

It is also plainly true when the definition of "government" is applied in RFRA's substantive prohibition, which provides that "[g]overnment shall not substantially burden a person's exercise of religion[,] * * * except as provided in subsection (b)." 42 U.S.C. 2000bb-1. There, all the listed actors—a "branch, department, agency, instrumentality, and official (or other person acting under color of law)," 42 U.S.C. 2000bb-2(1)— necessarily are named in an official capacity, since purely private conduct would not trigger RFRA's substantive restriction on what "government" may do. It thus should be equally true that when the same definition is applied in RFRA's remedial provision, an "official * * * of the United States" encompasses only an "official" sued in his or her official capacity—the only capacity in which a "branch, department, agency, [or] instrumentality" of the United States can be sued. *Ibid.*

Moreover, as respondents concede, "appropriate relief" does not encompass damages awards against the federal government itself in light of sovereign-immunity considerations. See Pet. App. 96a n.19.[4] Given that officials are covered by RFRA *only* by virtue of being "include[d]" within the term "'government'" pursuant to a definitional provision, see 42 U.S.C. 2000bb-2(1), it

---

[4] The courts of appeals that have addressed the issue have unanimously reached the same conclusion. See *Hale* v. *Federal Bureau of Prisons*, 759 Fed. Appx. 741, 744 n.4 (10th Cir.) (per curiam), cert. denied, 140 S. Ct. 196 (2019); *Davila* v. *Gladden*, 777 F.3d 1198, 1210 (11th Cir.), cert. denied, 136 S. Ct. 78 (2015); *Oklevueha Native Am. Church of Haw., Inc.* v. *Holder*, 676 F.3d 829, 840-841 (9th Cir. 2012); *Webman* v. *Federal Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006).

would be particularly jarring to read the phrase "appropriate relief" to authorize broader relief against an official than against the government of which the official is defined to be a part.

### 2. Congress did not intend to impose personal liability on individual federal officials through a novel damages remedy in RFRA

This straightforward reading of "appropriate relief" is confirmed by RFRA's statutory history and, in particular, the backdrop against which it was enacted and the subject it was intended to address. See *Branch* v. *Smith*, 538 U.S. 254, 271 (2003) (interpreting statute in light of the "circumstances of its enactment"). Prior to the passage of RFRA, this Court's precedents recognized injunctive relief against federal officials in their official capacities, but not damages liability in their personal capacities, as appropriate relief against the government for a violation of the Free Exercise Clause. In enacting RFRA and using the phrase "appropriate relief against a government" in the cause-of-action provision, Congress did not intend to upset that remedial status quo. Instead, it sought merely to abrogate the substantive standard for free-exercise violations adopted in *Employment Division* v. *Smith*, 494 U.S. 872 (1990). In light of this statutory history, the phrase "appropriate relief" is properly read not to authorize damages remedies against federal employees in their personal capacities. Even were the Court to conclude that the phrase was designed simply to reflect the law of remedies as it evolves over time, current precedent confirms that damages remedies against federal employees for free-exercise claims remain inappropriate.

a. At the time RFRA was enacted, an injunction operating against the government was considered the appropriate form of relief against federal officials for free-exercise violations. For instance, in *Davis* v. *Passman*, 442 U.S. 228 (1979), this Court noted its "established practice" of "sustain[ing] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Id*. at 242 (citation omitted). In addition, the APA, as amended in 1976, confirmed a plaintiff's ability to seek equitable relief for constitutional violations. See 5 U.S.C. 702, 704 (1976) (providing for judicial review of agency action and waiving sovereign immunity as to equitable relief).

By contrast, there was no pre-RFRA basis for damages awards against federal employees in their personal capacities for free-exercise violations. Before RFRA's enactment, the only potential basis for obtaining such damages would have been an implied action at law under *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, this Court implied a right of action for damages directly under the Constitution for a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures. *Id.* at 389. In the years shortly thereafter, the Court extended *Bivens* to two additional contexts, involving particular applications of the Fifth Amendment's Due Process Clause and the Eighth Amendment. See *Davis*, *supra*; *Carlson* v. *Green*, 446 U.S. 14 (1980).

In the decade that followed, however, this Court became increasingly cautious about implying causes of action and damages remedies against federal employees in their personal capacities in the absence of congres-

sional action. Importantly, that shift took place well before RFRA was enacted in 1993. See, *e.g.*, *Schweiker* v. *Chilicky*, 487 U.S. 412, 421 (1988) ("Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts."). Indeed, in the years immediately preceding RFRA's enactment, this Court repeatedly rejected *Bivens* claims in a variety of circumstances. See *Bush* v. *Lucas*, 462 U.S. 367 (1983); *Chappell* v. *Wallace*, 462 U.S. 296 (1983); *United States* v. *Stanley*, 483 U.S. 669 (1987); *Schweiker, supra*; see also *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1857 (2017). In *Bush*, for example, the Court declined to recognize an implied damages remedy in a First Amendment suit against a federal officer. 462 U.S. at 390. Thus, at the time Congress enacted RFRA, this Court had never recognized a personal damages remedy against a federal employee for a free-exercise violation, and its cases gave considerable reason to doubt that such a remedy was available.

b. Against this historical backdrop, had Congress intended to expand in a radical way the existing type of "appropriate relief"—especially such relief deemed to be "against a government"—one would expect at least *some* affirmative indication of that intent in the statutory text or legislative history. There is none. Instead, both the statutory text and all available evidence indicate that Congress's goal in enacting RFRA was to modify the substantive standard for free-exercise claims, not the type of appropriate relief. See *Branch*, 538 U.S. at 270 (construing statute in light of problems it was designed to address); John F. Manning, *What Divides Textualists From Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006) ("[T]extualists recognize that the relevant context for a statutory text includes the mischiefs

the authors were addressing."). Congress enacted RFRA in response to this Court's holding in *Smith*, which eliminated the compelling-interest test for free-exercise challenges to neutral laws of general applicability. 494 U.S. at 878. The congressional statement of purpose declares that RFRA was designed to restore the "compelling interest test" and "provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. 2000bb(b). As the Senate Report confirms, "the purpose of this act is only to overturn the Supreme Court's decision in *Smith*." S. Rep. No. 111, 103d Cong., 1st Sess. 12 (1993) (Senate Report); see H.R. Rep. No. 88, 103d Cong., 1st Sess. 15 (1993) (intent was to "'turn the clock back' to the day before *Smith* was decided").

Consistent with Congress's focus on restoring a particular substantive standard, nowhere in RFRA's text or legislative history is there any indication that Congress intended to expand dramatically the range of available remedies by authorizing damages awards against federal employees in their personal capacities. To the contrary, as noted above, the text, properly construed, limits relief to federal officials in their official capacities. And the legislative history similarly suggests that Congress did not expect damages to be available under RFRA. The Congressional Budget Office estimated that RFRA "would result in no significant cost to the federal government," and mentioned the possibility of attorney's fees but not damages. Senate Report 15-16.

In the absence of any evidence that Congress intended to expand the remedies available pre-RFRA, the statute's provision for "appropriate relief against a government" is best read to incorporate the *status quo ante*

that a personal damages award is not an appropriate form of relief in the context of a suit against a federal "official." But at most, in light of this history, the statutory phrase "appropriate relief against a government" should be read as tracking the law concerning such remedies as it develops over time. Cf. *West* v. *Gibson*, 527 U.S. 212, 218 (1999) ("The meaning of the word 'appropriate' permits its scope to expand to include Title VII remedies that were not appropriate before 1991, but in light of legal change are appropriate now."). Here, this Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61, 68 (2001), and has never recognized a *Bivens* claim based on the Free Exercise Clause, see *Reichle* v. *Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Ashcroft* v. *Iqbal*, 556 U.S. 662, 675 (2009). The Court's stringent test for implying a *Bivens* remedy in new contexts—adopted shortly after *Bivens* was decided and consistently reaffirmed since—makes clear that a damages remedy against federal employees in their personal capacities is not appropriate here. See *Abbasi*, 137 S. Ct. at 1855-1858; *Iqbal*, 556 U.S. at 675; Pet. App. 79a-94a (applying these precedents and rejecting respondents' *Bivens* claims).

Indeed, if a damages remedy were available for RFRA violations, it would create anomalous results given the unavailability of a *Bivens* remedy for free-exercise violations more generally. Plaintiffs could obtain damages when a neutral law of general applicability imposed a substantial burden on their rights, but could *not* obtain damages when facially discriminatory action

by federal officials imposed something less than a substantial burden. Because government action "that single[s] out the religious for disfavored treatment" lies at the core of the First Amendment prohibition, *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 137 S. Ct. 2012, 2020 (2017), it is unlikely that Congress intended such a discrepancy.

c. The court of appeals did not dispute that this Court had not recognized a *Bivens* free-exercise claim before RFRA's enactment. The court instead pointed to two decisions from its sister circuits. Pet. App. 42a (citing *Caldwell* v. *Miller*, 790 F.2d 589, 607-608 (7th Cir. 1986); *Jihaad* v. *O'Brien*, 645 F.2d 556, 558 n.1 (6th Cir. 1981)). But even if those two decisions had awarded damages under *Bivens* for free-exercise claims, that would hardly be evidence of a consistent practice that Congress might have approved in RFRA, cf. *Milner* v. *Department of the Navy*, 562 U.S. 562, 576 (2011)—especially in the face of this Court's intervening and more restrictive precedent.

In any event, those decisions did *not* award damages under *Bivens* for free-exercise violations. In *Caldwell*, the Seventh Circuit held that the plaintiff had stated a damages claim for the alleged loss of his personal legal and religious books, but that claim was brought under the Fifth Amendment's Due Process Clause, not the Free Exercise Clause. 790 F.2d at 594, 608. And while the plaintiff also asserted an unrelated free-exercise claim, the court of appeals did not analyze the availability of damages for that claim. *Id.* at 595-600. In *Jihaad*, the Sixth Circuit dismissed the plaintiff's free-exercise claim based on qualified immunity. 645 F.2d at 564. It also imported, without analysis, an earlier circuit decision allowing First Amendment free-speech claims to

proceed under *Bivens*. *Id.* at 558 n.1. But the court of appeals in that earlier case did not address the Free Exercise Clause at all, and of course it lacked the benefit of this Court's later decisions explaining the limits of *Bivens*. See *Yiamouyiannis* v. *Chemical Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir. 1975) (per curiam), remanded, 578 F.2d 164 (6th Cir. 1978) (per curiam), cert. denied, 439 U.S. 983 (1978). In short, neither *Caldwell* nor *Jihaad* remotely suggests that there was any pre-RFRA basis for awarding damages against federal officials in their personal capacities as an appropriate form of relief for free-exercise violations.

### 3. *Damages awards against federal officials in their personal capacities are not appropriate relief unless Congress clearly indicates that they are*

In addition, this Court should not find a damages remedy against federal officials absent a clear indication to that effect in the statute itself. Congress speaks clearly when imposing such a remedy, which implicates sensitive separation-of-powers considerations and can impose heavy burdens on Executive Branch functioning. In the absence of a clear sign of congressional intent, there is no basis to presume that Congress intended to invade the rights of the Executive Branch. And as this Court recognized in *Sossamon*, the word "appropriate" does not "clearly identify[] money damages." 563 U.S. at 286.

a. When Congress determines that a damages remedy against federal officers and employees in their personal capacities is an appropriate form of relief, it says so explicitly. As the district court observed, "*every* other federal statute identified by [respondents] as recognizing a personal capacity damages action against federal officers * * * includes specific reference to the

availability of damages." Pet. App. 103a (emphasis added); see 18 U.S.C. 2520(b)(2) ("appropriate relief includes * * * damages * * * and punitive damages"); 42 U.S.C. 1985(3) ("action for the recovery of damages"); 47 U.S.C. 605(e)(3)(B)(ii) (court "may award damages"); 50 U.S.C. 1810(a) and (b) ("aggrieved person * * * entitled to recover" "actual damages[,] * * * liquidated damages[,] [and] * * * punitive damages"). As the district court further observed, "[respondents] have not pointed to a single statute where 'appropriate relief' was interpreted to include such a remedy without an explicit definition to that effect." Pet. App. 103a; see *id.* at 55a (Jacobs, J., dissenting from the denial of rehearing en banc) ("If a statute imposes personal damages liability against individual federal officers, one would expect that to be done explicitly.").

Congress's reaction when courts have authorized an award of money damages against federal employees in the absence of clear statutory guidance is telling. For example, after this Court held that federal employees could be sued under state tort law for certain actions taken within the scope of their employment, Congress "reacted quickly" to expand federal employees' immunity from such suits. *Gutierrez de Martinez* v. *Lamagno*, 515 U.S. 417, 425-426 (1995) (describing Congress's response to *Westfall* v. *Erwin*, 484 U.S. 292 (1988)). In so doing, Congress sought to forestall a "crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the entire Federal workforce." *Id.* at 426 (quoting Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 2(a)(5), 102 Stat. 4563). Similar concerns are present here: in performing their duties, a

wide range of federal personnel charged with implementing neutral statutes, regulations, or policies of general applicability—including in a wide range of agencies, such as the Bureau of Prisons and the Drug Enforcement Administration—would face personal liability for RFRA violations were respondents to prevail.

Section 1983, although it generally applies to state rather than federal officials, confirms Congress's practice of employing express language to authorize personal damages liability against government personnel. Section 1983 provides that "[e]very person who, under color of [state law]," deprives another of a federal right "shall be liable to the party injured in an action *at law*" as well as a "suit in equity." 42 U.S.C. 1983 (emphasis added). The phrase "at law" makes clear that Congress intended to authorize damages awards against state officials. *City of Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 751 (1999) (Souter, J., concurring in part and dissenting in part) (Section 1983 "provides * * * for actions at law with damages remedies"); see *Curtis* v. *Loether*, 415 U.S. 189, 196 (1974) (damages are "the traditional form of relief offered in the courts of law").

Section 1983 is particularly instructive when set beside RFRA. The court of appeals noted that RFRA applies to an "official (or other person acting under color of law)." 42 U.S.C. 2000bb-2(1). The court thought that language "comparable" to Section 1983, which imposes liability on "'person[s]' who, acting 'under color of [state law],'" violate an individual's federal rights. Pet. App. 21a-22a (citing *Mack* v. *Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016)); see *Mack*, 839 F.3d at 302 ("Because RFRA's definition of 'government' tracks the language

72

of [Section] 1983, it is reasonable to assume that liability can be imposed similarly under both statutes."). The court of appeals thus reasoned that because both Section 1983 and RFRA constrain those who act "under color of" law, they should impose the same remedies on that set of actors. Pet. App. 21a-22a, 32a & n.12.

That simply does not follow. It is Section 1983's reference to an "action at law" that permits damages liability, and of course RFRA has no such language. The phrase "color of [state law]" in Section 1983, like the similar phrase in RFRA, serves a different purpose: it speaks to the *types of actors subject to suit*, not the types of available remedies. Contrary to the panel's reasoning, Congress's omission of the phrase "action at law" (or comparable language) in RFRA confirms that it did not intend the phrase "appropriate relief"—especially as part of the broader phrase "appropriate relief *against a government*"—to encompass a damages remedy against federal employees in their personal capacities. See Pet. App. 53a-54a (Jacobs, J., dissenting from the denial of rehearing en banc) (RFRA's omission of language "akin to [Section] 1983's explicit endorsement of suits for money damages * * * was not a careless oversight"). Section 1983, by contrast, permits an action against "[e]very person" acting under color of law, without RFRA's overarching limitation that any appropriate relief be "against a government." That is yet another indication RFRA was not designed to track the individual-damages model of Section 1983.

b. Requiring that Congress use explicit language to authorize personal damages awards as an appropriate form of relief against federal employees makes good sense. Imposing the threat of damages liability on a

broad range of Executive Branch personnel administering neutral federal laws, regulations, and policies of general applicability would raise sensitive separation-of-powers concerns. Congress is best suited to assess those variables and make a considered judgment as to whether a damages remedy is appropriate. The absence of a clear indication that Congress affirmatively chose in RFRA to impose personal damages liability on individual federal employees means that it does not qualify as "appropriate relief."

i. The costs of a damages remedy against federal employees in their personal capacities—and the concomitant potential for disruption to Executive Branch operations—would be significant. As this Court recognized in *Abbasi*, a damages remedy imposes "burdens on Government employees who are sued personally," preventing them from "devoting the time and effort required for the proper discharge of their duties" and forcing them instead to expend their energies on defending litigation. 137 S. Ct. at 1858, 1860; see *Tenney* v. *Brandhove*, 341 U.S. 367, 377 (1951) (referencing "the cost and inconvenience and distractions of a trial"). Damages remedies against federal employees in their personal capacities also impose "costs and consequences to the Government itself," potentially including costs of "defense and indemnification." *Abbasi*, 137 S. Ct. at 1856, 1858.

More fundamentally, these concerns are especially "pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief," because "[t]he risk of personal damages liability is more likely to cause an official to second-guess difficult but

necessary decisions" in matters committed to the Executive Branch. *Abbasi*, 137 S. Ct. at 1861; see *Barr* v. *Matteo*, 360 U.S. 564, 571 (1959) (plurality) (conferring absolute official immunity in part on the ground that the "threat of" damages suits "might appreciably inhibit the fearless, vigorous, and effective administration of policies of government"). These chilling effects could have systemic implications to the extent they "call into question the formulation and implementation of a general policy," *Abbasi*, 137 S. Ct. at 1860—an outcome that is particularly likely given RFRA's focus on "rule[s] of general applicability," see 42 U.S.C. 2000bb-1(a). And litigation over general policies "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Abbasi*, 137 S. Ct. at 1861.

This case illustrates the distinct harms that a RFRA damages remedy would impose. "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task," as "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit * * * protection." *Thomas* v. *Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); see *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 531 (1993). In this case, respondents assert a RFRA violation despite apparently having never informed petitioners that they "believed cooperating with an investigation 'burdened their religious beliefs.'" Pet. App. 58a (Jacobs, J., dissenting from the denial of rehearing en banc). If RFRA were held to permit personal-capacity damages actions, then federal officials whose decisions or conduct allegedly burden the exercise of a person's religious beliefs—including those not "comprehensible to others," *Thomas*, 450 U.S. at 714—would be faced

with the potential for disruptive litigation followed by a possibly devastating damages award. Even well-intentioned federal employees would thus be forced to navigate a minefield of liability that would be difficult to predict or avoid. Cf. *Nieves* v. *Bartlett*, 139 S. Ct. 1715, 1725 (2019) ("Any inartful turn of phrase or perceived slight * * * could land an officer in years of litigation."). And although qualified immunity would mitigate these burdens in some respects, it could not eliminate them. See pp. 32-34, *infra*.

Intrusion on Executive Branch operations would be all the more troublesome when the judicial action, as in this case, concerns the exercise of core Article II authority. See *Abbasi*, 137 S. Ct. at 1861. Respondents' allegations pertain to the No Fly List and purported efforts by FBI agents to obtain assistance in connection with investigations into potential terrorist activity, including by aliens. These issues implicate national security as well as immigration, both inherent executive powers. See *ibid.* (national security); *Haig* v. *Agee*, 453 U.S. 280, 292 (1981) (same); *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977) (immigration). The costs of chilling official decision-making, or diverting government personnel from their official duties, are "only magnified" in the national-security context. See *Iqbal*, 556 U.S. at 685. The burden of discovery in this context would also be acute. This case well illustrates the problem, as placements on the No Fly List are often based at least in part on classified information. See, *e.g.*, *Kashem* v. *Barr*, 941 F.3d 358, 381-383 (9th Cir. 2019).

ii. Respondents have suggested (Br. in Opp. 12-15) that qualified immunity could mitigate the harm to the Executive Branch that a personal-capacity damages remedy under RFRA would inflict. But the Court has

already rejected that argument in the *Bivens* context, reasoning that "the availability of a damages action * * * for particular *injuries* * * * is a question logically distinct from immunity to such an action on the part of particular *defendants*." *United States* v. *Stanley*, 483 U.S. 669, 684 (1987). So too here, the question of whether to infer a damages remedy against individual federal employees like petitioners in the absence of clear congressional guidance is distinct from whether petitioners would be qualifiedly immune from this suit.

Moreover, there are good reasons for treating the immunity question separately from the remedies question. "The doctrine of qualified immunity is not [a] panacea." *Atwater* v. *City of Lago Vista*, 532 U.S. 318, 351 n.22 (2001). "[E]ven where personal liability does not ultimately materialize, the mere 'specter of liability,'" *ibid.* (citation omitted), might deter employees from carrying out their duties to the fullest extent, see *Barr*, 360 U.S. at 571. And a damages remedy might "inhibit public officials in the discharge of their duties" for the additional reason that "even those officers with airtight qualified immunity defenses are forced to incur 'the expenses of litigation' and to endure the 'diversion of their official energy from pressing public issues,'" *Atwater*, 532 U.S. at 351 n.22 (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 814 (1982)) (brackets omitted).

To take a concrete example, qualified immunity would not necessarily spare petitioners or other future defendants from the burdens of discovery. See *Iqbal*, 556 U.S. at 685 (noting that discovery "exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government").

Contrary to their current suggestion that qualified immunity could be decided here on the pleadings (Br. in Opp. 13), respondents maintained below that the issue could be resolved only "with the benefit of full factual development" and that "[d]iscovery * * * would be essential." Resp. C.A. Supp. Letter Br. 2, 4 (July 24, 2017). Federal employees themselves might require discovery from the government at the qualified-immunity stage, as information relevant to whether a particular act served a "compelling governmental interest," 42 U.S.C. 2000bb-1(b), might often not be in the possession of individual federal employees in their personal capacities.

A damages remedy would inflict all of these costs even if courts applied qualified immunity with perfect accuracy. But as Judge Jacobs explained below, "qualified immunity is never a foregone conclusion, and many courts * * * have occasionally failed to apply it when appropriate." Pet. App. 58a (Jacobs, J., dissenting from the denial of rehearing en banc); see, *e.g.*, *City of Escondido* v. *Emmons*, 139 S. Ct. 500, 502 (2019) (per curiam) (reversing denial of qualified immunity where "[t]he Ninth Circuit offered no explanation for its decision," and its "unexplained reinstatement of the excessive force claim * * * was erroneous—and quite puzzling"). The significant threat of *erroneous* damages liability amplifies the concerns discussed above.

iii. Congress is the proper Branch to weigh the relevant factors and "consider if 'the public interest would be served'" by imposing a damages remedy on federal employees personally. *Abbasi*, 137 S. Ct. at 1857 (quoting *Schweiker*, 487 U.S. at 427). As part of that weighing, Congress may consider both "whether," and "the

extent to which," personal monetary liability is appropriate. See *id.* at 1856. In short, "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie* v. *Robbins*, 551 U.S. 537, 562 (2007) (citation omitted); see *Abbasi*, 137 S. Ct. at 1857 ("When an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them.") (citation and internal quotation marks omitted).

Here, Congress has not clearly subjected individual federal employees to personal damages actions through its use of the phrase "appropriate relief against a government." 42 U.S.C. 2000bb-1(c); see *Sossamon*, 563 U.S. at 286. To the contrary, the far better reading of that language is that it does *not* authorize damages. Accordingly, this Court should refrain from making a judgment that Congress declined to make, and instead hold that damages are not "appropriate relief" in this context.

### 4. *This Court has held that damages are not "appropriate relief" under RFRA's companion statute, RLUIPA*

Lastly, the Court should construe the statutory phrase "appropriate relief" to bar damages liability here because it construed the identical phrase in *Sossamon* to preclude an award of damages against a State under RLUIPA. As originally enacted, RFRA applied to both the federal government and state and local governments. See 42 U.S.C. 2000bb-2(1) (Supp. V 1993). In *City of Boerne* v. *Flores*, 521 U.S. 507, 532 (1997), however, this Court invalidated RFRA's state and local applications as exceeding Congress's powers under the

Fourteenth Amendment. Congress responded by enacting RLUIPA in reliance on its powers under the Spending Clause, U.S. Const. Art I, § 8, Cl. 1, Commerce Clause, U.S. Const. Art. I, § 8, Cl. 3, and Fourteenth Amendment. RLUIPA enables certain state and local prisoners and individuals regulated by state and local land-use law "to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Holt* v. *Hobbs*, 574 U.S. 352, 358 (2015) (quoting *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)). Its remedial language is materially identical to RFRA's: a person may "obtain appropriate relief against a government," 42 U.S.C. 2000cc-2(a), and "'government'" includes an "official" and "any other person acting under color of State law," 42 U.S.C. 2000cc-5(4)(A)(ii)-(iii).

Interpreting RLUIPA's identical language in *Sossamon*, this Court held that damages are *not* "appropriate relief" against a State. 563 U.S. at 288. The Court began with "the plain meaning of the text," Pet. App. 52a (Jacobs, J., dissenting from the denial of rehearing en banc), noting that the word "'appropriate'" draws its meaning in significant part from "context." 563 U.S. at 286. The Court observed that "[t]he context here— where the defendant is a sovereign—suggests, if anything, that monetary damages are not suitable or proper." *Ibid.* (internal quotation marks omitted). The Court further explained that "where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, we will not consider a State to have waived its sovereign immunity," and concluded "that the phrase 'appropriate relief' in RLUIPA is not so free from ambiguity that we may conclude that the States, by receiving federal funds, have unequivocally

expressed intent to waive their sovereign immunity to suits for damages." *Id.* at 287-288.

The same general reasoning applies in this case. As in RLUIPA, the phrase "appropriate relief" in RFRA draws its meaning in large part from context. Here, the relevant context—including the broader statutory language, the pre-RFRA remedial landscape, separation-of-powers concerns, and *Sossamon* itself—indicates that damages awards against individual federal employees in their personal capacities are not "appropriate relief." And although damages actions against individual federal employees would not implicate sovereign immunity, they would implicate analogous separation-of-powers concerns.

At a higher level of generality, "[g]iven that RFRA and RLUIPA attack the same wrong, in the same way, in the same words, it is implausible that 'appropriate relief against a government' means something different in RFRA, and includes money damages." Pet. App. 53a (Jacobs, J., dissenting from the denial of rehearing en banc). That result would be particularly anomalous given the broader legal landscape. Consistent with *Sossamon*, no court of appeals that has analyzed the question has permitted damages awards against individual state officials in suits brought pursuant to RLUIPA.[5]

---

[5] The vast majority of decisions addressing individual monetary liability under RLUIPA pertain to the Spending Clause aspect of the statute, and typically rest on the ground that state officials are not direct recipients of federal funds and thus are not personally bound by the conditions RLUIPA places on the acceptance of those funds. See, *e.g.*, *Washington* v. *Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (per curiam); *Sharp* v. *Johnson*, 669 F.3d 144, 153-155 (3d Cir.), cert. denied, 567 U.S. 937 (2012); *Rendelman* v. *Rouse*, 569 F.3d 182, 188-189 (4th Cir. 2009); *Sossamon* v. *Lone Star State of*

As a result, under respondents' interpretation, a damages award is not "appropriate relief" against either the federal government, a State, or a state official under RFRA or RLUIPA, but it would be appropriate against individual federal officials in their personal capacities. There is no logic to such a scheme, and no evidence that Congress intended it. See *United States* v. *Bergh*, 352 U.S. 40, 45 (1956) (declining to "attribute such anomalous results to the Congress").

### B. The Counterarguments Lack Merit

The court of appeals' reasoning (embraced by respondents) does not warrant a contrary understanding of the phrase "appropriate relief." As noted, RFRA defines the term "'government'" to "include[]" an "official" (along with a "branch, department, agency, [or] instrumentality") of the United States, 42 U.S.C. 2000bb-2(1). But that simply ensures the comprehensive reach of RFRA's substantive prohibition against measures taken under federal authority that substantially burden religion without sufficient justification, 42 U.S.C. 2000bb-1(a) and (b), and clarifies that one way to obtain

---

*Tex.*, 560 F.3d 316, 328-329 (5th Cir. 2009), aff'd, 563 U.S. 277 (2011); *Haight* v. *Thompson*, 763 F.3d 554, 567-570 (6th Cir. 2014); *Nelson* v. *Miller*, 570 F.3d 868, 886-889 (7th Cir. 2009); *Wood* v. *Yordy*, 753 F.3d 899, 904 (9th Cir. 2014); *Stewart* v. *Beach*, 701 F.3d 1322, 1333-1335 (10th Cir. 2012); *Smith* v. *Allen*, 502 F.3d 1255, 1271-1275 (11th Cir. 2007), abrogated on other grounds by *Sossamon*, *supra*. With respect to RLUIPA's other applications, at least one court has similarly rejected the availability of damages, on the ground that "appropriate relief" must have a consistent meaning across all its applications. See *Haight*, 763 F.3d at 569. Although certain courts have permitted damages against *municipalities* under RLUIPA, see, *e.g.*, *Centro Familiar Cristiano Buenas Nuevas* v. *City of Yuma*, 651 F.3d 1163, 1168-1169 (9th Cir. 2011), those cases are inapposite here because such relief nevertheless runs "against a government."

"appropriate relief against a government" is by enjoining its agents. It does not authorize damages awards against individual federal officers and employees in their personal capacities, which do not run against the government. Furthermore, the supposed presumption that damages are *always* an appropriate form of relief under a federal cause of action has no application in this context, and in any event is overcome for this particular statute.

### 1. RFRA's definition of "government" does not render damages awards against individual federal officials in their personal capacities "appropriate relief against a government"

The court of appeals reached its conclusion in large part by substituting RFRA's definition of "'government'"—which "includes" an "official (or other person acting under color of law) of the United States," 42 U.S.C. 2000bb-2(1)—for the defined term itself. Pet. App. 18a-19a. In the court's view, a personal damages award against an individual federal official represents "appropriate relief against" an "official," and then automatically represents "appropriate relief against a government." 42 U.S.C. 2000bb-1(c); Pet. App. 18a-19a. That approach was mistaken. RFRA's definition of "government" does not change the meaning of the phrase "appropriate relief," and for the many reasons discussed above, damages awards against federal employees in their personal capacities do not fall within the meaning of that phrase.

Just as fundamentally, in construing a defined term, a court "cannot forget that [it] ultimately [is] determining the meaning of" that term, and accordingly must take its "ordinary meaning" into account. *Leocal* v. *Ashcroft*, 543 U.S. 1, 11 (2004); accord *Johnson* v.

*United States*, 559 U.S. 133, 140 (2010) ("We think it clear that in the context of a statutory definition of 'violent felony,' the phrase 'physical force' means violent force.") (emphasis omitted); *United States* v. *Doe*, 960 F.2d 221, 225 (1st Cir. 1992) (Breyer, C.J.) ("[W]e must read the definition in light of the term to be defined."). Here, the defined term is "government," and a personal damages award against an individual federal officer or employee simply does not qualify as relief against the "government" under a plain and common-sense understanding of that term.

There is no need, however, to choose between the statutory definition and the ordinary meaning of relief "against a government." Petitioners' interpretation—that "appropriate relief" encompasses official-capacity injunctive relief, but not an award of personal-capacity money damages, against federal officers—harmonizes the two, and gives meaning to both. Suits for injunctive relief, unlike those for damages, comport with RFRA's requirement that relief be awarded "against a government." Although the government itself might not be a named defendant, such suits are brought against the government *in effect*. See *Lewis* v. *Clarke*, 137 S. Ct. 1285, 1291 (2017). Because "the Government can act only through agents," "'when the agents' actions are restrained, the sovereign itself may, through [the agents], be restrained.'" Pet. App. 76a n.6 (quoting *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)) (brackets in original). This point is made especially clear by the fact that, "when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation." *Lewis*, 137 S. Ct. at 1292.

In addition, under petitioners' interpretation, the definitional phrase "official (or other person acting under color of law)" confirms that a plaintiff may obtain relief against the government in the form of an injunction against federal personnel as well as private parties acting under color of law. 42 U.S.C. 2000bb-2(1). Injunctive relief against federal officers in their official capacities has traditionally been reconciled with sovereign immunity through the notion that ultra vires conduct by officials is not taken on behalf of the government, see *Larson*, 337 U.S. at 689-691, and Congress's inclusion of the phrase "official (or other person acting under color of law)" simply makes clear that injunctive relief against the government encompasses injunctive relief against all those acting under its authority, even if in an unlawful manner.[6] Reading RFRA's reference to an "official" as limited to suits for injunctive relief against federal officials in their official capacities thus gives meaning both to the statutory definition and the overarching limitation of remedies to "appropriate relief against a government." 42 U.S.C. 2000bb-1(c), 2000bb-2(1).

The terms of the statutory definition itself confirm this interpretation. The word "official" appears as an item in a list, and is preceded by the terms "branch, department, agency, [and] instrumentality." 42 U.S.C.

---

[6] The parenthetical phrase "other person acting under color of law" likewise confirms that private actors effectively exercising government authority—for instance, operators of a private prison under contract with the government, see *Richardson* v. *McKnight*, 521 U.S. 399 (1997)—are also subject to RFRA's substantive requirements. See *Brentwood Acad.* v. *Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 & n.2 (2001); *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 928-932 (1982).

2000bb-2(1). Each of those preceding terms necessarily refers to official-capacity actors. An "agency," for example, cannot either act or be sued in anything but an official capacity. The Court should construe the term "official" as similarly limited to official-capacity acts and suits. See *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995) (invoking "the doctrine of *noscitur a sociis*"—that a "word is known by the company it keeps"—"to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress'") (citation omitted). Indeed, no one disputes that the term "government" (including its component "official") is limited to official-capacity acts under RFRA's substantive provision. 42 U.S.C. 2000bb-1(a) and (b) ("Government shall not substantially burden a person's exercise of religion" except in limited circumstances). It would make no sense to apply this prohibition to "official[s]" acting in their purely personal capacities. And there is no basis for adopting one reading of "official" under RFRA's substantive prohibition and another under its remedial provision. See *Clark* v. *Martinez*, 543 U.S. 371, 382 (2005) (rejecting "novel interpretive approach * * * [that] would render every statute a chameleon").[7]

---

[7] The inclusion of the phrase "other person acting under color of law" in the list, 42 U.S.C. 2000bb-2(1), does not change the analysis. This language is best read, consistent with the above analysis, to cover private individuals only insofar as they act with a government imprimatur, *i.e.*, in the functional equivalent of an official capacity. See *Washington State Dep't of Soc. & Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (citation omitted).

*Stafford* v. *Briggs*, 444 U.S. 527 (1980), adopts a similar analysis. There, the Court construed a venue statute governing "civil action[s] in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority." *Id.* at 531 (quoting 28 U.S.C. 1391(e) (1970)). Interpreting that language, the Court rejected the plaintiff's argument that the phrase "under color of legal authority" encompasses suits for damages against federal officials in their personal capacities, *id.* at 539, reasoning that "[a] suit for money damages which must be paid out of the pocket of the private individual who happens to be—or formerly was—employed by the Federal Government plainly is not one 'essentially against the United States,'" *id.* at 542; H.R. Rep. No. 1936, 86th Cong., 2d Sess. 2 (1960); see *Stafford*, 444 U.S. at 542 n.10 ("Here, it is against individuals and not against the Government that a money judgment is sought."). The Court explained that the phrase "under color of legal authority," rather than authorizing damages awards, was intended to allow suits not only against an officer in his official capacity but also suits nominally against an individual officer who was acting within the apparent scope of his authority and not in a private capacity. See, *e.g.*, *id.* at 539. The phrase thus clarifies that the venue provision applies whether the defendant is acting "in an official *or apparently official way*." *Id.* at 536 & n.6 (emphasis added).[8]

---

[8] Although Section 1391(e), unlike RFRA, refers to "an officer or employee * * * acting *in his official capacity*," 28 U.S.C. 1391(e) (1970) (emphasis added), that textual distinction makes no difference to the question presented here. Section 1391(e) employs the phrase "official capacity" to specify the capacity in which the officer

### 2. Franklin *does not require a presumption in favor of personal damages awards against federal officials under RFRA*

In concluding that personal damages awards against individual federal employees qualify as "appropriate relief," the court of appeals also relied heavily on this Court's decision in *Franklin* v. *Gwinnett County Public Schools*, 503 U.S. 60 (1992), which it understood to endorse a presumption that money damages are available under all federal causes of action absent a clear indication to the contrary. See Pet. App. 24a-26a. *Franklin* does not support the court of appeals' conclusion, both because it does not apply in this context and because, even if it did, the presumption would be overcome for this particular statute.

a. *Franklin* involved the scope of remedies for the private cause of action that this Court had implied under Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, in *Cannon* v. *University of Chicago*, 441 U.S. 677 (1979). In the absence of any statutory guidance, the *Franklin* Court held that it would "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 503 U.S. at 66. Examining Title IX itself and other indicia of congressional intent, the Court found no indication "Congress ha[d] limited the remedies available to a complainant" in such a way as to foreclose damages. *Id.* at 73. The Court therefore held that damages were available in a suit under Title IX. *Id.* at 76.

---

acted rather than the capacity in which the officer is sued. See *Stafford*, 444 U.S. at 536. No one disputes that RFRA is similarly limited to an official's official actions, and does not govern off-duty conduct. Moreover, Section 1391(e) lacks the even stronger language—that relief must be "against a government"—included in RFRA.

*Franklin* is inapposite here for three reasons. First, *Franklin* interpreted an implied cause of action. The Court thus had to fill in the gap left by Congress's silence, and it did so by presuming that all remedies were available. See *Franklin*, 503 U.S. at 69; see also *Sossamon*, 563 U.S. at 288 ("With no statutory text to interpret, the Court 'presume[d] the availability of all appropriate remedies'") (quoting *Franklin*, 503 U.S. at 66) (brackets in original). By further requiring "clear direction" from Congress to overcome that presumption, see *Franklin*, 503 U.S. at 70-71—when Congress had not given any direction on the subject—the Court's methodology effectively foreordained the availability of damages. See *id.* at 78 (Scalia, J., concurring in the judgment) ("To require, with respect to a right that is not consciously and intentionally created, that any limitation of remedies must be express, is to provide, in effect, that the most questionable of private rights will also be the most expansively remediable.").

*Franklin* is inapplicable when, as in this case, a statute contains both an express cause of action and an express remedies provision. Indeed, this Court has never applied *Franklin* to recognize the availability of a disputed remedy in the context of an express remedies provision. The question in this case is how best to interpret RFRA's remedial provision, which requires asking whether damages awards against federal employees personally are "appropriate relief against a government," 42 U.S.C. 2000bb-1(c), considered in light of all relevant context. In other words, the Court's task here is to determine what Congress said—not to draw inferences from congressional silence. Section 2000bb-1(c)'s meaning thus should be resolved using the usual tools

of statutory interpretation—not a generalized presumption designed for congressional silence.[9]

Second, because *Franklin* arose under Title IX, it obviously did not address personal damages awards against federal employees. See *Franklin*, 503 U.S. at 63-64 (plaintiff alleged misconduct by public school teachers and administrators). As discussed, damages awards against federal employees implicate separation-of-powers concerns, and thus should not be imposed in the absence of clear direction from Congress, regardless of any judicially created background presumption that might apply in other contexts. See Part A.3, *supra*.

Third, this Court's subsequent decision in *Sossamon* confirms that *Franklin* does not apply here. In *Sossamon*, the Court declined to apply the *Franklin* presumption when interpreting the phrase "appropriate relief against a government" in RLUIPA. 42 U.S.C. 2000cc-2(a); see 563 U.S. at 288. As the Court explained, any presumption under *Franklin* "is irrelevant to construing the scope of an express waiver of sovereign immunity." 563 U.S. at 288, 289 n.6. The Court instead relied on the contrary presumption that damages are not available against a sovereign unless "Congress has given clear direction that it intends to *include*

---

[9]  There is no indication that Congress's use of "appropriate relief" in RFRA was consciously intended to track the use of that phrase in *Franklin* itself. See, *e.g.*, *Franklin*, 503 U.S. at 69, 74. The phrase "appropriate relief" was first introduced into the draft of RFRA in 1990, two years before this Court decided *Franklin*. See H.R. 5377, 101st Cong., 2d Sess., § 2(c) (1990). Nothing in the legislative history suggests that any Member of Congress subsequently considered *Franklin* to be relevant when deciding what kinds of remedies would be available under RFRA's provision for "appropriate relief against a government."

a damages remedy." *Id.* at 289. Consistent with *Sossamon*, the courts of appeals have uniformly held not only that damages are unavailable against States under RLUIPA, but also that they are unavailable against the federal government under RFRA. See p. 19 n.4, *supra* (collecting cases).

To be sure, RFRA's cause of action applies to the government itself as well as its constituent entities and "official[s]." 42 U.S.C. 2000bb-2(1). But that feature of RFRA's cause of action means that this case cannot be decided simply by pointing to a background presumption that damages are usually available, when damages are in fact *not* available for the primary class of defendants (the "government" and its sovereign entities) identified in the statute. 42 U.S.C. 2000bb-1(c). Rather, the Court should apply the rule applicable to the federal government and its components—that damages are not "appropriate relief"—to cover all of RFRA's applications, including in suits against "official[s]" of the United States, who are also part of the government. "It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern." *Clark*, 543 U.S. at 380. Under the lowest-common denominator approach, the unavailability of damages against the government and its branches, departments, agencies, and instrumentalities dictates the unavailability of damages against *all* defendants under RFRA, even if the considerations of sovereign immunity that apply to the government itself do not apply to its officers and employees. See *Haight* v. *Thompson*, 763 F.3d 554, 569 (6th Cir. 2014) (Sutton, J.) (citing the

"general presumption that language in a statute means the same thing in all settings" in rejecting the argument that RLUIPA permits personal-capacity damages actions under the Commerce Clause but not the Spending Clause).

b. Even if the *Franklin* presumption applied, the presumption is a rebuttable one. See Pet. App. 35a. In *Franklin*, to assess whether Congress gave the requisite "clear direction" to overcome the presumption and foreclose a particular remedy, see 503 U.S. at 70-71, the Court looked to contextual clues like background principles of law and subsequent statutory developments, see *id.* at 71-73. Using those same guideposts here—in addition to the statutory text and context, which were not available to the *Franklin* Court and cut strongly against recognition of a damages remedy—it is clear that Congress did not view personal damages awards against individual federal employees as "appropriate relief" for violations of RFRA.

In particular, *Franklin* held that courts should look to "the state of the law when the Legislature passed" the statute at issue. 503 U.S. at 71. Here, the background rule at the time of RFRA's enactment was that damages were not an appropriate remedy against individual federal officers and employees for free-exercise violations. See Part A.2, *supra*. *Franklin* also looked to subsequent congressional action. In that case, Congress amended Title IX after this Court had already implied a cause of action under it. 503 U.S. at 72. The amendment made available "remedies both at law and in equity" against States "to the same extent as such remedies" would be available against a non-state actor. *Id.* at 72-73 (quoting 42 U.S.C. 2000d-7(a)(2)). The

92

Court concluded that the amendment effectively ratified a damages remedy under the implied right of action. In this case, by contrast, subsequent events give rise to the opposite conclusion. The Court has further narrowed the scope of the *Bivens* remedy since RFRA's enactment, and Congress has taken no steps to counteract that trend. Moreover, Congress also passed a companion statute, RLUIPA, that uses the identical "appropriate relief" phrase but does not provide a damages remedy against States. *Sossamon*, 563 U.S. at 282.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted.

> NOEL J. FRANCISCO
> *Solicitor General*
> JOSEPH H. HUNT
> *Assistant Attorney General*
> JEFFREY B. WALL
> EDWIN S. KNEEDLER
> *Deputy Solicitors General*
> HASHIM M. MOOPPAN
> *Deputy Assistant Attorney General*
> AUSTIN L. RAYNOR
> *Assistant to the Solicitor General*
> BENJAMIN H. TORRANCE
> SARAH S. NORMAND
> ELLEN BLAIN
> MARY HAMPTON MASON
> REGINALD M. SKINNER
> *Attorneys*

JANUARY 2020

# APPENDIX

1.   42 U.S.C. 2000bb provides:

**Congressional findings and declaration of purposes**

**(a)     Findings**

The Congress finds that—

(1)   the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2)   laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3)   governments should not substantially burden religious exercise without compelling justification;

(4)   in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5)   the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b)     Purposes**

The purposes of this chapter are—

(1)   to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2)    to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

2.    42 U.S.C. 2000bb-1 provides:

**Free exercise of religion protected**

**(a)    In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b)    Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1)    is in furtherance of a compelling governmental interest; and

(2)    is the least restrictive means of furthering that compelling governmental interest.

**(c)    Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.    Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

3.   42 U.S.C. 2000bb-2 provides:

**Definitions**

As used in this chapter—

(1)   the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(2)   the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3)   the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4)   the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

4.   42 U.S.C. 2000bb-3 provides:

**Applicability**

**(a)     In general**

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

**(b)     Rule of construction**

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

**(c)    Religious belief unaffected**

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

5.    42 U.S.C. 2000bb-4 provides:

**Establishment clause unaffected**

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause").    Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter.    As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.